[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 154 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 155 
The bank, it appears, was in want of money, and Mr. Lynch, its cashier and chief financial officer, proposed to borrow, upon the certificate of deposit now in question, and several others of a like character. The certificates were executed by him, as cashier, in the usual form, and an agent was employed by him to go to New York and negotiate them for cash in behalf of the bank. Without stating details, the plan was carried into effect. The plaintiff, in New York, advanced on the particular certificate in question the sum of $4,850, upon *Page 156 
an understanding that he was not to present it to the bank for payment in less than thirty days. The sum advanced was some $80 less than the face of the certificate, after making due allowance for interest and exchange. The amount was placed by the agent with Duncan, Sherman Co., the correspondents of the bank in New York, where it was subject to the order of the bank, or would be applied in reducing the balance then due to those correspondents. Such was the transaction, according to its professed and ostensible character; and, so far, there is no dispute about the facts.
The first questions presented are, whether the bank had power to borrow the money, and whether the cashier was a proper agent to execute that power without any special delegation of authority thus to act. That the power to borrow existed, was determined by this court, upon the fullest examination, in the case of Curtis
v. Leavitt (15 N.Y., 9). That the cashier, in virtue of his general employment, could exercise the power, was not denied upon the argument, and the proposition does not admit of a reasonable doubt.
In the next place, if the bank could borrow money, it could execute and deliver an assurance or undertaking for the payment of the sum loaned in any form not forbidden by the terms or just interpretation of some statute of this State. This was also settled in the case above mentioned. There is no pretence that these certificates of deposit, payable, as they were, on demand, fall within any of the restraints imposed by law upon the banking institutions of the State. They were therefore valid instruments, so far as any question of corporate power to issue them is concerned.
Conceding, however, that such instruments could be lawfully issued, it is nevertheless denied that the certificates now in question were executed by the proper agents, so as to make them obligatory upon the bank. The 21st section of the general banking act (Laws of 1838, 250) provides that "contracts made by any such association, and all notes and bills by them issued and put in circulation as money, shall be signed by the president or vice-president and cashier thereof." Certificates *Page 157 
of deposit, it is claimed, are contracts, and, in order to have any validity, must be signed by the president or vice-president as well as cashier. I have no doubt that they are contracts, not only according to the general interpretation of that term, but within the meaning of the statute referred to. In a case, therefore, where the president or cashier of one of these associations has no powers delegated to him, either in the articles of association or in the by-laws, by particular appointment or by usage and custom in the bank, it may be that the signature of one of them to a contract, without the other, will not bind the institution. It is not probable that such cases are frequent amongst the banking associations of this State; but we can conceive of an instance where there is a total absence of all delegated power, except such as may be implied in being chosen to fill one of those offices. If the statute is to be taken as excluding all possible modes of executing contracts except the one specified, it can be applied only to such a case. Where the association itself confers no authority in any mode of delegation — in other words, where the power of the agent to act is derived from the statute alone — the particular agents who can act are pointed out; and it may, for the sake of argument, be conceded, that the power is vested in them to the exclusion of others. The Legislature, in authorizing the formation of banking associations, were calling into existence a class of artificial beings, of which there had been no example in this State. These existences were partnerships, or associations, with certain attributes of corporations, such as the right to a common seal, the power of perpetual succession, c. It was deemed necessary, therefore, or at least wise and proper, to point out a mode of executing contracts so as to render them binding on all the associates. This was done in the 21st section, by designating the president and cashier as the agents who were to sign them.
But there is nothing in the terms of this provision which necessarily deprives the association itself of the right to enlarge the powers of those agents, or to appoint others to make contracts on its behalf. Whatever a natural person can do in *Page 158 
dealing with others, he can appoint any agent to do. So, all acts within the powers of a corporation may be performed by agents of its own selection. If associated banks form an exception to this principle, it is, I think, an anomaly nowhere else to be found in the statute or the common law. It is usual for the associates in these banking institutions to vest all their powers irrevocably in a board of directors, to be annually chosen. That this can be lawfully done, has never been, and I think ought not to be, doubted. If, then, the whole board of directors should enter into an agreement for the purchase of land for a banking-house, would that agreement be void for want of the cashier's signature? If written proposals should be made to one of these associations to build a banking-house, and the board should, by resolution, accept the proposals and enter into the contract, would not that be a binding obligation? Again, if the board should, by resolution, delegate, either to the president or cashier, or to a committee, the power and duty of employing a teller, and of entering into a written contract for the services required, and a contract should be made accordingly, would it be unauthorized and void? It is said that the cashier cannot, alone, enter into any species of written contract. But suppose the board of directors should afterwards, by unanimous resolution, adopt and ratify it, the question arises, have they, or have they not, the power to do so, and thus to make the agreement binding on the association? I do not entertain a doubt that, in all these instances, the exercise of power would be regular, and the association bound by the agreement. The error which leads to the opposite conclusion is in supposing that the association can only bind itself by the particular agents named in the statute — a construction which virtually vests in them all the powers of the corporate body — because no written agreement can be entered into without their consent. Indeed, either one of them, acting alone, holds an absolute negative over the proceedings of the entire body. A cashier, having, as is often the case, no interest or stock, may frustrate the will of every associate by refusing to sign his name. This, I am persuaded, is not the true construction of *Page 159 
the statute. Where the associates have not lodged the power elsewhere; where the matter is to be determined upon the statute alone, without any action of the artificial body, contracts within the scope of its general powers must be signed by the president or vice-president and cashier, as the statutory agents. But the statute was not designed as an appointment of particular agents, to the exclusion of all right in the corporate or associate body itself to appoint other agents to do lawful acts and enter into lawful contracts.
A different conclusion must lead to results both mischievous and absurd. As banking is carried on in this State, it is often if not generally the case that the president takes no part in the ordinary and daily routine of business. Contracts and engagements are entered into every day by the cashiers and tellers, amounting, without doubt, to many millions of dollars. A customer, who deposits money, requires a certificate or a draft or a check to be certified. These are all contracts. A certificate is a promissory note; a draft is nothing else than a bill of exchange; and the usual certification written upon a customer's check is equivalent to an acceptance and undertaking to pay, on which the bank is liable. (Farmers' and Mechanics'Bank v. Butchers' and Drovers' Bank, 16 N.Y., 125.) If they are not contracts within the meaning of the statute, then the certificate now in question is not one, and the objection, that it is not signed by the president, of course falls to the ground. But they are undoubtedly contracts, within every possible definition of the term, and they are made in the daily business of every bank, without the signature of the president. The signature of the cashier or teller is sufficient to render them valid obligations, because those agents derive their authority from the association, and their acts thus become the acts of the association. So, in the present case, it is proved to have been a custom in the bank for the cashier, without the president, to sign and issue certificates of deposit. Such a custom could not have been unknown to the board of directors. The cashier, therefore, in issuing such instruments, acted under their authority, and, in so doing, he wielded the power of the corporation *Page 160 
itself. The corporation, therefore, cannot be permitted to repudiate these obligations, on the mere ground that they were not duly executed.
In considering the question so far I have not noticed the case of Safford v. Wyckoff, President, c. (4 Hill, 442.) In that case the action was upon a bill of exchange drawn by the cashier of a banking association, without the signature of the president or vice-president. The Supreme Court had decided that the action could not be maintained, on the ground that the corporation had no power to issue negotiable instruments except circulating notes countersigned by the Comptroller. (1 Hill,
11.) In the Court of Errors that question was examined, as well as the one whether the bank could be bound by the signature of the cashier only. The judgment was reversed, and both questions were necessarily determined in the plaintiff's favor. I do not concur in all the reasoning which led to that result, but the point now under consideration was fully considered and was decided. That decision has never been departed from; and, I think, never questioned in any other case. It was a determination of the court of last resort, and has entered very largely into the business and dealings of the community with the banks of this State. If we now disregard it, we shall jeopardize many interests and endanger many contracts.
Passing, then, these questions of power and regularity, it only remains to consider whether there was error at the trial in respect to any other ground of defence. On the trial the certificate appears to have been regarded, by the defendant, as an instrument falsely declaring that money had been deposited in the bank, and, on that ground, as fraudulent and void in the hands of Mr. Hollister, to whom it was delivered by the cashier. This fraud being assumed, it was claimed that the plaintiff, in order to entitle himself to recover, must prove that he took the certificate in good faith and for value. These views have been also urged upon the argument in this court. But this defence rests upon a confused and illogical notion of the real nature of the case. It assumes that the certificate *Page 161 
was issued without consideration, and therefore fraudulently, to be held by Hollister, as an obligation against the bank, and to be negotiated, if at all, for the benefit of himself or of some confederate in the fraud. This is a misconception of the facts. The certificate was not intended to be an operative instrument in the hands of Hollister. On the contrary, it was signed and placed in his possession, as an agent of the bank, to be delivered by him to such person as would advance money thereon for the benefit of the institution. The plaintiff was that person, and in his hands it first became a valid security. Until then it was not a delivered instrument, and could not be a fraudulent one. When he advanced the money, that very money became the consideration on which alone the obligation rested. As there could be no fraud in such a transaction, the proposition urged at the trial, that the plaintiff must prove himself a bona fide holder, was properly overruled. No question of good faith arises when a borrower delivers his own note to a lender, as an assurance for the payment of the loan. Nor does the interposition of an agent between the dealers alter the nature of the transaction.
There is only one possible view of the case in which a question of fraud could arise. The transaction was ostensibly, and was in fact, a loan of money to the bank, and the money was placed within its control by being put to its credit on the books of its correspondents in New York. The cashier, as an individual, had, thus far, nothing to do with the transaction. It is inferable however, from the evidence, that he was in the habit of fraudulently using the funds of the bank; and it may be true that, while borrowing this very money in the name and professedly for the benefit of his institution, he intended to appropriate it to his own private use. Assuming this fact, he intended to commit a fraud upon his principal, and the plaintiff advancing the money with notice of such a design, would be a participator in the wrong. I do not infer from the bill of exceptions that the defendant relied at all upon this view of the case. The judge, however, charged in general terms, that if the cashier made and issued the certificate *Page 162 
with intent to defraud the bank, and the plaintiff received it with notice of that fact, the verdict should be for the defendant. In my opinion this instruction was all that the case called for. The fraud, if there was any of the kind now supposed, rested in the mere intention of the cashier, and so far as we know, was confined to his own breast. Was the plaintiff bound to produce affirmative evidence that he had no knowledge of this fraudulent design? I am clearly of opinion that he was not. The fact was to him entirely inaccessible. It could only be inferred from a knowledge of the fraudulent practices in which the cashier was engaged; but those had not yet become known to the president and directors engaged in the management of the same institution. The plaintiff resided some two hundred and forty miles distant, and was a stranger not only to the bank but to its cashier. He had no right or opportunity to examine the books of the one, or to become acquainted with the dealings of the other. It was, perhaps, unusual for the certificate of a country bank to be offered in New York at a discount, with a request that it should not be presented for payment in thirty days. Conceding this, and giving full force to the circumstances, the only result is that the plaintiff should have inquired into the origin of the instrument. We will assume that he did so inquire. That inquiry conducted him to the precise facts, and he ascertained that, the bank being in want of money, the cashier proposed to borrow it, and for that purpose made and issued the certificate on which he, the plaintiff, was asked to make the advance for thirty days. No possible inquiry could lead him to a knowledge of the cashier's imputed design to embezzle the funds. It is indeed a new doctrine that a person, having dealt with an agent who is acting within his acknowledged powers, must prove that he did not know of the agent's design to abuse his trust by appropriating to his own use the proceeds of the dealing. If such a doctrine cannot be maintained, as clearly it cannot, then there is no error of which the defendant can complain in the present case.
The judgment should be affirmed. *Page 163