### OF THE

# STATE OF NEW YORK.

32   9
92h 398

32b  9
34ap165

32b    9
68 A.D²462

WILLIAM BRIDENBECKER, president of the Frankfort Bank, *vs.* LIBERTY L. LOWELL.

Where a bank places notes, of which it is the holder, in the hands of an indorser, to be used by him in obtaining an indemnity from the maker, it thereby consents to be bound by the indorser's acts, and to that extent constitutes him its agent; notwithstanding the indorser, in making use of the notes, acts on his own behalf, and for his own indemnity.

The cashier of a bank, as its executive officer, has authority to take such measures for the security and eventual collection of a debt as he deems proper, and to act, in reference to the collection or compromise of the same, according to the general usage, practice and course of. business.

In the absence of evidence that a cashier of a bank was restricted in his authority, it will be assumed that a transmission of promissory notes held by the bank, to an indorser, to enable the latter to obtain an indemnity from the maker, was within the scope of his authority.

It is not necessary that the indorser should be constituted the agent of the bank by formal letter of attorney. It is sufficient that he is put in possession of the notes, with apparent authority in respect to them, to make him the agent of the holder.

Under such circumstances, as between the maker of the notes and the bank, the latter is bound by the acts of the indorser, in respect to the notes placed in his hands, as well by reason of the authority necessarily and expressly conferred, in view of the purpose for which the notes were sent, as by reason of the apparent authority with which the agent was clothed, and upon the faith of which the maker had a right to act.

Where a bank, for the purpose of enabling an indorser of notes held by the bank, to obtain payment or security from the maker, transmitted the notes to the indorser, who thereupon made an arrangement with the maker, by which property was transferred to the indorser for the payment of the notes, and the latter were surrendered up to the maker, to be canceled; and the bank, on being informed of what had been done, accepted a part of the fruits of the arrangement, without objection, and had never repudiated the transaction, or reclaimed the notes; *it was held* that the bank had, by such subsequent acts and acquiescence, ratified the acts of the agent.

In such a case, if the principal does not intend to abide by the acts of his agent, he should dissent, and give notice within a reasonable time. If he fails to do so, an assent to, or ratification of, the acts of the agent will be presumed.

Although the conveyance of the property is made to the agent, directly, and not to the bank, yet by the transfer a trust is created, for the payment of a debt due to the bank; and the fund thus provided belongs to the bank, and may be controlled by it. But the debt is not discharged, as between the bank and the maker of the notes.

A specific fund is dedicated and set apart by the debtor, and received by the creditor, for the payment of the debt; and if, upon a sale of the property, it proves insufficient to satisfy the debt, the debtor will be personally liable for the deficiency.

Where an arrangement is made between debtor and creditor, by which the former gives a new security upon property exceeding the amount of the debt secured, in value, and receives back the evidences of his indebtedness; there being at the time a general fund, or security by mortgage upon real estate, embracing all the debts of the debtor, but insufficient to pay the whole; the effect of such an arrangement is to make the specific security the primary fund for the payment of the debt specifically secured by it, and to postpone the right of that debt to participate in the general fund, until the specific fund has been exhausted.

Where the intent of the parties to a mortgage is to provide a security for all the debts of the mortgagor, and not to secure one debt by the mortgage, and then to secure the next debt incurred upon the residue of the mortgage, but rather that all shall stand as if contracted at the same time, the debts must share ratably in the fund realized from the security; without regard to priority of date.

Where a creditor, having several claims against his debtor, receives a portion of the entire amount in a judicial proceeding founded upon them all, as upon

Bridenbecker *v.* Lowell.

the foreclosure of a mortgage given to secure all the debts, the law will apply such money as a payment ratably upon all the claims. The creditor has no right to apply it to the satisfaction of some of the demands—especially to the payment of a debt for the payment of which a specific fund has been provided—to the entire exclusion of others.

Where money is received by a bank upon the foreclosure of a mortgage given to secure to the bank the payment of all paper then held, or thereafter to be held, by it, upon which the mortgagor should be liable as maker, indorser or acceptor, the cashier has no right, without authority from the directors of the bank, or the knowledge or assent of the mortgagor or his indorsers, to appropriate such money, or any part thereof, to the payment of notes of the mortgagor, indorsed by such cashier, to the exclusion of other notes of the mortgagor, held by the bank.

In such a case, the indorsers of other notes of the mortgagor, held by the bank, have a right, legal as well as equitable, to share ratably in the fund and security provided generally for the debts due the bank ; and this right cannot be affected, or impaired, by any act of the bank or its officers.

The fact that money received by a cashier, as such, upon a sale of mortgaged premises, for a debt due the bank, has been kept by him nominally separate from the funds of the bank, and that it stands to his individual credit on the books of the bank, will not authorize him to appropriate the same to the payment of a portion of the debts secured by the mortgage, to the exclusion of the rest.

The agents of a bank, occupying a confidential relation towards it, cannot act as such in matters in which they have a personal interest

Where the cashier of a bank has been employed by an indorser of paper held by the bank, to look after his interests and see that he shares equally in a security provided for the benefit of all occupying a similar position, and he has undertaken to act in that capacity, it will be a fraud upon his principal if he appropriates the funds in such a manner as to exclude him.

Where a fund, thus raised, is in the possession of a bank, if the law does not appropriate it to the payment of the several debts due the bank, ratably, the debtor not having appropriated it, the creditor, alone, can make the application.

In such a case it is the right of the creditor to make the application of a payment in such manner as he pleases ; provided he makes the election within a reasonable time, and the application made is not inequitable

But it is inequitable, in respect to the debtor, as well as to other sureties, for the creditor to apply the fund in hand to a debt for the payment of which a specific fund has been provided.

If a person authorizes another to assume the apparent right of disposing of property in the ordinary course of trade, it must be presumed that the apparent authority is the real authority ; and he may bind his principal, within the limits of the authority with which he has been apparently clothed, with respect to the subject matter. *Per* ALLEN, J.

Bridenbecker *v*. Lowell.

A general agency is therefore constituted, not by the authority which the agent actually receives, from his principal, but by that which the latter allows the agent to assume. *Per* ALLEN, J.

THIS action was brought against the defendant as an indorser of a note for $1000, made by one Gates, dated July 23d, 1855, and payable in ninety days from date. In September, 1856, the Frankfort Bank held notes of Gates indorsed by one Etheridge, to the amount of about $2300, a like note indorsed by one Chipps for $500, notes indorsed by Pomroy, the cashier of the bank, for about $1000, and the note in suit. There had been paid to the bank, or to Pomroy, the cashier, from the avails of a chattel mortgage which had been given to Etheridge to secure him against his indorsements, and which had been assigned by him to the bank, $524.50. There was also, afterwards, and after the arrangement with Etheridge hereinafter mentioned, paid to the bank or its cashier $2220.50, the amount realized from a mortgage upon real property, given August 10th, 1855, by Gates to the bank, conditioned " to pay to the said bank all paper then held or thereafter to be held, by the said bank, upon which the said Gates should be liable as maker, indorser or acceptor." From this $2250.50 the note indorsed by Chipps was paid, with the consent of the defendant, and, as it would seem, of all parties interested. In September, 1856, Gates having removed to Wisconsin, and Etheridge being also in that state, the cashier of the bank, at the request or suggestion of Etheridge, inclosed and sent to him by mail the notes of Gates, indorsed by him, with a statement of all the indebtedness of Gates to the bank, to enable the indorser, Etheridge, to obtain security from Gates. Etheridge commenced an action on the notes, in the courts of Wisconsin, in the name of the bank, and attached or garnisheed the property of Gates to answer the debt. Thereupon Gates conveyed to Etheridge certain real property in Wisconsin, absolutely, and suffered him to take some $500 in money which was subject to the attachment, and took from him an agreement that in case he should realize more than enough,

Bridenbecker *v.* Lowell.

from the sale of the land conveyed, to pay the amount owing to the Frankfort Bank, (having reference to the debt for which Etheridge was liable as indorser,) and the expenses incurred by him in relation thereto, he would pay the surplus, if any, to said Gates. The suit was thereupon discontinued and the notes delivered to Gates. The money received by Etheridge on this arrangement, less the costs and expenses of the action, was remitted to the bank and received by it, and information was given to the bank of the arrangement, and it acquiesced in it. Afterwards, the $2220.50 was received, and the Chipps note paid out of it, as before stated. At the same time that the Chipps note was paid, Pomroy, the cashier, paid from the $2220.50 two notes of Gates, held by the bank and indorsed by him, for $500 and $300, respectively; the three notes, including interest, amounting, in the aggregate, to $1383.45. The application of the money by the cashier to the payment of the notes indorsed by himself, to the exclusion of the others, was on his own motion, and without authority from the directors of the bank, or the knowledge or assent of Gates or the defendant. In December, 1856, Etheridge took the place of Pomroy as cashier, and on the day before he entered upon the duties of his office he and Pomroy, without the knowledge or assent of the directors of the bank, or the defendant, or Gates, applied $657.13 of the $2220.50 to the payment of Etheridge's liability to the bank as indorser for Gates upon the notes delivered up to be canceled; leaving $180.12 still unappropriated, of that fund. Pomroy paid Etheridge of this $80.56, and balanced Gates' account which was overdrawn to the amount of $157.56.

The action was tried before a referee, and upon the trial, and at its close, the defendant claimed, in various forms, to be entitled to some benefit or allowance in discharge or reduction of his liability on account of the fund received by the bank from the real estate mortgage, and also urged various other defenses which it was claimed were established. The referee

gave judgment for the full amount of the note and interest, and from that judgment the defendant appealed.

*R. Earl,* for the appellant.

*F. Kernan,* for the respondent.

*By the Court,* ALLEN, J.   The defendant insists that the referee erred in holding that Etheridge was not the agent of the plaintiff for the settlement of the debt in suit with Gates in Wisconsin, and that the same was not satisfied and discharged by the arrangement then made.   Had Etheridge undertaken to compromise and discharge the note in suit, it might, at least, have been plausibly argued, upon the evidence, that he was the authorized agent of the plaintiff in that behalf, with full power to treat and act in respect to it. There was some conflict of evidence upon the question whether the note in suit was, in truth, taken into consideration and provided for in the settlement which was made between Etheridge and Gates ; and if it had depended entirely upon the oral evidence, the referee might well have found that this note entered into, and formed a part of, the consideration for the transfer of property then made by Gates to Etheridge.   Especially might this have been so found if the plaintiff is right in his claim that the transfer to Etheridge was only by way of security, and not in discharge of Gates' former liability.   The several indorsers for Gates, including the then cashier of the plaintiff, up to that time and for some time subsequent thereto, had acted in concert, with a view to the mutual benefit and protection of each other, and in contemplation of a division of the final loss.   Etheridge testifies that after taking the conveyance in Wisconsin he told the defendant that the property would pay the entire indebtedness of Gates, into about $1000, and that deficiency he and the defendant with Pomroy, would pay in equal parts, after the sale of the property and the application of the proceeds.   Pomroy says that the

Bridenbecker *v.* Lowell.

defendant always wanted the moneys recovered applied pro rata on the several liabilities, and that he never dissented from that proposition : and that he only consented to the application of the moneys to the payment of the liability of Etheridge on condition that an arrangement should be made between the defendant and Etheridge satisfactory to both, and that he consulted the defendant about the payment of the Chipps note because he might be interested in the application of the funds. That the defendant was away from home a great deal of the time, and left the matter with him (Pomroy) to protect his interest, so far as he could, and see that he fared like others. A statement of all the indebtedness of Gates to the bank was sent at the time the notes surrendered were transmitted to Etheridge, and was exhibited at the time of the arrangement. But the written memorandum of the parties will control the oral evidence and the other circumstances of the case, and to arrive at the agreement of the parties all the papers executed by them at the time of the arrangement and as evidence of its terms, must be read together. The paper given by Etheridge to Gates and Phillips, (who was associated with Gates in some way, and as it would seem liable with him for the debt,) is general in its terms, and, subject to a verbal criticism, is sufficiently comprehensive to include the entire debt of Gates to the bank. By it Etheridge agrees to account for the property transferred, after the payment of the amount due and owing to the Frankfort Bank and the expenses incurred by him in relation to it. He had incurred no expenses, so far as appears, except in relation to that part of the debt for which he was liable as indorser. But this alone would not restrict and limit the general description of the debts provided for, to that one class. The paper, however, executed by Gates and Phillips at the same time and as a part of the same transaction, specified the notes which made up the amount of the indebtedness they were owing the Frankfort Bank, and to secure which they had given the deed of land, and the notes indorsed by Etheridge and surrendered

on that occasion are the only notes referred to. These papers, making together a single written agreement of the parties, exclude from the arrangement the note in suit. The referee was therefore right in deciding that Etheridge did not undertake to act for the bank in respect to this note. The other questions relate to the effect of the dealing by Etheridge in respect to the notes indorsed by him and surrendered to Gates, upon the rights of the defendant and his liability in this action. No objection was taken, upon the trial, to the sufficiency of the answer, or to any defense, in whole or in part, legal or equitable, established by the evidence, for the reason that it was not warranted by the pleadings, and the decision of the referee is made upon the merits and not upon any technical ground that might have been obviated by an amendment. The objection, therefore, taken for the first time upon this appeal, to the answer, cannot prevail, even if it had been well taken on the trial. The referee was asked to decide that Etheridge was the agent of the bank in reference to all the notes which he had at the time of the settlement at Madison, and that those notes were canceled and given up to Gates, in consideration of the property then and there turned out by Gates, and that sufficient money remained in the bank to pay the notes in suit, if it had been properly applied. That the notes having been paid at Madison it was improper to pay them again out of the proceeds of the property in Herkimer county; and that the funds transferred on the books of the bank by Pomroy and Etheridge to pay those notes, were still in the bank applicable to pay this note. The case contains a prolix statement of facts found by the referee, but he does not definitively pass upon the agency of Etheridge as a question of fact. He merely states the circumstances, and the acts of the party in detail, and then says that he was not, and did not act, as the agent of the bank in any other way than as stated, in the narrative of the circumstances. As matter of law he decided that Etheridge was not the agent of the bank at Madison, but acted for his own indemnity as indors-

Bridenbecker *v.* Lowell.

er of the notes sent to him, and that the bank had never rat-
ified the acts of Etheridge in respect to such notes.

It is true that Etheridge did act on his own behalf and for his
own indemnity, but it is no less true that the bank, by placing
the notes in his hands to be used in obtaining that indemnity,
consented to be bound by his acts, and to this extent consti-
tuted him its agent. The cashier of the bank, as its execu-
tive officer having charge of its whole moneyed transactions
in paying and receiving debts, and discharging and transferring
securities, had authority to take such measures for the secu-
rity and eventual collection of the debt as he deemed proper,
and to act in reference to the collection or compromise of the
debt, according to the general usage, practice and course of
business. (*Story on Agency*, § 114. *Minor* v. *Mechanics'
Bank of Alexandria*, 1 *Peters*, 46. *Dunlap's Paley on Agen-
cy*, 156, *n.* 1.) In the absence of evidence that the cashier
was restricted in his authority it will be assumed that the
transmission of the notes to Etheridge for the purpose men-
tioned was within the scope of his authority. It was not
necessary that Etheridge should be constituted the agent of
the bank by formal letter of attorney. It was sufficient that
he was put in possession of the notes, with apparent authority
in respect to them, to make him the agent of the holder.
That his interest was identical with that of the holder does
not detract from his authority, but rather strengthens the ap-
parent authority with which he was clothed. There was an
implied authority deducible from the nature and circumstances
of the act of the bank in sending the notes to Etheridge. By
the act of the bank Etheridge was clothed with the apparent
right of disposing of them, and in such case it will be assumed
that the apparent authority is the real authority. (*Story on
Agency*, §§ 93, 94, 228, 81.) If a person, authorizes another
to assume the apparent right of disposing of property in the
ordinary course of trade, it must be presumed that the ap-
parent authority is the real authority ; and he may bind
his principal within the limits of the authority with which

he has been apparently clothed, with respect to the subject matter. (*Per Lord Ellenborough, Pickering* v. *Bush,* 15 *East,* 43. *Johnson* v. *Jones,* 4 *Barb.* 369.) A general agency is therefore constituted, not by the authority which the agent actually receives from his principal, but by that which the latter allows the agent to assume. But the authority of Etheridge to deal with the notes as he should think for his interest was express, and necessarily resulted from the purpose for which they were sent to him, to wit, that he might be enabled to secure himself, in whole or in part, against loss by reason of his liability to the bank. He was the only responsible party to the note, and as the bank relied upon him, and him alone, there was no good reason why he might not be permitted to make such use of the notes as should best secure his purpose.

Unless Etheridge could control the notes and coerce their payment by suit against Gates, or negotiate and deal with Gates in relation to them, the hope expressed by the cashier, in his letter transmitting them to Etheridge, that he might succeed in getting the security he had spoken of, would have been a vain hope, and the expression an idle one, and the sending of the notes would have been a farce.

As between Gates and the bank, the latter was bound by the acts of Etheridge in respect to the notes transmitted, as well by reason of the authority necessarily and expressly conferred in view of the purpose for which the notes were sent, as by reason of the apparent authority with which the agent was clothed, and upon the faith of which Gates had a right to act.

But if the authority, as originally conferred, was not, for any reason, ample to bind the bank to the extent of the dealings of the agent, the acts of the latter were ratified by the subsequent acts and acquiescence of the principal. The bank was advised of what had been done, and within a very few days, and as early as October, 1856, received a part of the fruits of the arrangement, and has never repudiated the trans-

action, or reclaimed the notes. If it did not intend to abide by the acts of Etheridge in the premises, it should have dissented, and given notice within a reasonable time; and not having done so, an assent to, or ratification of the acts will be presumed. When the principals received a letter from their agent, in July, informing them of what he had done, and they were silent until October and then for the first time complained, they were considered to have waived any right of action they might have had. (*Cairnes* v. *Bleecker,* 12 *John.* 300. 2 *Kent's Com.* 316. *Benedict* v. *Smith,* 10 *Paige,* 127.) It follows that the bank must abide by the acts of Etheridge in accepting the transfer of property and surrendering the notes to Gates to be canceled.

It is true the conveyances were to Etheridge directly, and not to the bank; but by the transfer a trust was created for the payment of a debt due to the bank, and the fund provided belonged to the bank and might be controlled by it; first, as having been taken by its agent in his own name, the agent in such case taking as trustee and not in his own right; (*Torrey* v. *Bank of Orleans,* 9 *Paige,* 663;) and second, as the surety of Gates for the payment of the debt, receiving security from the principal debtor to which the creditor was entitled. (*Curtis* v. *Tyler,* 9 *Paige,* 432. *Heath* v. *Hand,* 1 *id.* 329.) A fund was then provided for the payment of the notes delivered up for the benefit and by the assent of the bank. Whatever may have been the rights of the bank as against Etheridge as the indorser of those notes, as between the bank and Gates the trust was for the benefit of the bank, and upon satisfaction of the debt from the trust fund to the trustee, the agent and trustee of the bank, the debt would be discharged quoad the bank as well as the indorser. That the trustee was personally liable for the same debt did not affect his relation to the principal debtor and the creditor, growing out of the transaction by which the trust was created. If this was not the effect of the whole transaction, as between the bank and Gates, then it must be held that by suffering Etheridge to possess

and deal with the notes for his own benefit, and to obtain a valuable property from the maker upon and in consideration of the delivery of them to be canceled, the bank consented to, and did, discharge Gates from all liability to it, and took Etheridge as their sole debtor—a view much more fatal to the plaintiff than that before taken ; for in that view there was from that time no right in the bank to look to Gates or his property for the payment of the debt, or to appropriate any fund of Gates in satisfaction of it.    But the just view of the transaction and its effect is as before intimated.    The debt was not discharged, as between the bank and Gates.    A specific fund was dedicated and set apart by the debtor and received by the creditor for its payment, and whether the personal remedy against the debtor was suspended until the trust was closed and the entire fund applied in payment of the debt, it is not necessary to inquire.    But if, upon a sale of the property, in the execution of the trust, it should prove insufficient to satisfy the debt, the debtor, Gates, would be personally liable for the deficiency.    The written agreement of the parties treats the debt as still subsisting and as due and owing from Gates to the bank, and not as a debt discharged and paid by the transfer of the property to Etheridge.

The debt remaining, it constituted one of the debts secured by and entitled to share in the real estate mortgage given by Gates directly to the bank, in August, 1855, and before any of the notes in evidence were made.    At the time of the arrangement with Etheridge the bank had foreclosed its mortgage and the mortgaged premises had been sold by the cashier, Pomroy, and were held doubtless in trust for the bank.    The bank had realized no money from the security, and had not appropriated it to any particular debt of Gates to the bank, but it was held as security generally for "all the debts."    The effect of the arrangement with Etheridge was, by giving a new security upon property which, as the evidence tends to show, exceeded the debt secured in value, for the notes delivered up and canceled, as between the two funds or securities, the one

general and embracing all the debts but insufficient to pay a very considerable portion of them, and the other specific to secure a given debt, to make the specific security the primary fund, for the payment of the debt specifically secured by it, and to postpone the right of that debt to participate in the general fund until the specific fund should be exhausted. It is claimed that the cashier held the money realized from the sale of the mortgaged premises, and that it stood to his individual credit on the books of the bank until the appropriation was made. But it was received by him as cashier, for a debt due the bank, and was the money of the bank from the time of its receipt, notwithstanding the breach of trust of the cashier in keeping it nominally separate from the funds of the bank. The bank must be held to have received it at the time it came to the hands of the cashier, which was on the 23d of October, 1856. I pass by the attempted appropriation of over $800 of it by Pomroy without the knowledge or assent of any other person, to the payment of a debt for which he was personally responsible, with the single remark, that in case it shall ever be investigated a serious question will arise as to his right, acting as the financial officer of the bank, and at the same time as the friend and agent of the present defendant, in relation to the power to appropriate it to relieve himself from a personal liability, and thus act for himself and his two principals, each having distinct interests and the interest of each being distinct and adverse to his own. It is possible it can be sustained against the equal equities of other sureties as well as against the possible interests of the bank, that might, if the right of appropriation was vested in it, have an interest in applying it to some debt of Gates not so well secured as that indorsed by Pomroy. But it is by no means certain. As to the residue, there was no appropriation of it until the 16th of December, 1856, and then Pomroy having paid his debt without difficulty merely by directing as cashier a credit on the books of the bank, Etheridge came in as cashier, and by the same process took to himself the benefit of the

residue of the fund; and the debt to the bank not being quite sufficient to exhaust it, he took $80.56 in cash to balance the account; so that even if the present defendant had in turn came in as cashier the next day, he could not have had the same benefits of his office that appear to have been taken and enjoyed by his predecessors. I am of the opinion that the acts of Pomroy and Etheridge were insufficient to appropriate the money, and that portion of the debt of Gates which was secured upon the Wisconsin property and by the Etheridge trust. (1.) They were the agents of the bank, occupying a confidential relation towards it, and could not act as such in matters in which they had a personal interest. (*Story on Agency*, § 210 *et seq. Moore* v. *Moore,* 1 *Selden,* 256.) (2.) Pomroy was intrusted by the present defendant to look after his interests and see that he shared in the security equally with the others; and having undertaken to act in that capacity, it was a fraud upon the defendant to appropriate the funds to his exclusion. (3.) The fund was in the possession of the bank, and if the law did not appropriate it to the several debts due the bank, ratably, the debtor not having appropriated it, the creditor alone, and not the two indorsers acting in hostility to the third, could make the appropriation.

But aside from this, under the circumstances of this case, the bank itself could not, by the solemn act of its directors, have appropriated any part of this fund, realized from the mortgaged premises, to the payment of the notes provided for in the Etheridge trust. Regarding the fund realized from the mortgaged premises as so much money paid by the debtor, without indicating how, or to which of the debts, it should be applied, it was the right of the creditor to make the application of the partial payment in such manner as he pleased; provided he made the election within a reasonable time, and the application made by him was not inequitable. (*Field* v. *Holland,* 6 *Cranch,* 27. 15 *Wend.* 19.)

Judge Story says: "If the creditor has a right, in any case, to elect to what debt to appropriate an indefinite pay-

ment, it seems proper that he should have it only when it is utterly indifferent to the debtor to which it is applied, and then, perhaps, his consent that the creditor may apply it as he pleases, may fairly be presumed." (*Story's Eq. Juris.* § 459, *d.*) In this case it was inequitable in respect to the debtor, as well as to the other sureties, to apply the fund in hand to the debt for the payment of which a specific fund had been provided; and it was not indifferent to the debtor, for by such application he was left liable to be called upon for immediate payment of the debt not thus provided for and paid, while, by a different application, he was relieved from his liability to protect his indorsers, *pro tanto*, who were not specifically secured, and his property was equitably applied to the discharge of his debts. Pothier lays down the rule that "the application ought to be made to the debt for which the debtor has given sureties, rather than to them he owes singly." (*Story's Eq. Juris.* § 459, *c*, note 3. *Marryatts* v. *White*, 2 *Starkie*, 101.) The honor of the debtor is concerned in such payment. Having provided for the payment of the notes delivered up, he was more particularly interested in providing for the note not thus protected; and justice to the parties bound for him required the application of the fund to these debts, and the creditor had no right to make any other application of the fund. The referee therefore erred in deciding that the moneys realized from the sale of the premises mortgaged by Gates had been exhausted by being applied to the payment of the notes indorsed by Etheridge, and which were secured upon property in Wisconsin.

But within well settled principles, the defendant, without reference to the Eldridge trust, had a right, legal as well as equitable, to share ratably with both Pomroy and Etheridge in the fund and security provided generally for the debts due the bank; and this right could not be affected or impaired by any act of the bank or its officers. The note indorsed by the defendant appears to have been the debt first created in point of time, and to have first matured among the notes held by

the bank, with the single exception of that indorsed by Chipps, and which was paid with the defendant's consent.

Applying our rule as laid down in the books, to wit, that if debts are contracted at divers times upon the securities of the same farms or mortgages, the moneys arising from the pledges would in such case be applied in the first place to the discharge of the debt of the oldest standing, (9 *Cowen,* 777, *note,*) the whole fund would be applicable to the payment of the note in suit. But the interest of the parties was doubtless to provide a security for all the debts, and not to secure one debt by the mortgage, and then secure the next debt incurred upon the residue of the mortgage, but rather that all should stand as if contracted at the same time. In such case the debts must share ratably in the fund realized from the security. (9 *Cowen, supra.*)

Where a creditor, having several claims against his debtor, receives a portion of the entire amount, in a judicial proceeding founded upon them all, the law will apply such money as a payment ratably upon all the claims. The creditor has no right to apply it to the satisfaction of some of the demands, to the entire exclusion of others. (*Cowperthwaite* v. *Sheffield,* 1 *Sandf. S. C. Rep.* 416, *affirmed,* 3 *Comst.* 243.)

The moneys realized by the bank were the fruits of a judicial proceeding or sale upon the foreclosure of a mortgage given to secure all the debts, and were therefore within the principle of this case. But the security and its application must be the same whether given by the debtor voluntarily or obtained *in invitum.* It is a principle of equity which controls and gives the rule of law in both cases, and as there is no distinction in principle there can be none in the rule. Before the bank can claim to share in respect to the notes delivered up, the value of the property, or the proceeds of the property, transferred to Etheridge for their payment, must be deducted. (*Cowperthwaite* v. *Sheffield, supra.*) Perhaps a suit in the nature of a bill in equity may be necessary to settle all the equities of the parties. But the judgment must be

reversed and a new trial granted, for the reasons stated. Some part of the fund was applicable to the note in suit, and must be deemed as actually paid upon it.

Judgment reversed and new trial granted; costs to abide the event.

[ONONDAGA GENERAL TERM, July 3, 1860. *Allen, Mullin* and *Morgan,* Justices.]