### TAYLOR v. COMMERCIAL BANK.

(Supreme Court, Appellate Division, Fourth Department.   January 7, 1902.)

1. APPEAL—NONSUIT—DETERMINATION OF EVIDENCE.

The plaintiff, on an appeal from a nonsuit, is entitled to have all disputed facts construed as established in his favor.

2. FRAUD—MISREPRESENTATION—KNOWLEDGE OF FALSITY.

A person falsely assuming a knowledge of certain facts, and making representations thereto, without knowing either the truth or falsity thereof, is subject to the same liability from injuries resulting therefrom as if they were made with full knowledge of the facts.

3. SAME—EVIDENCE—SUFFICIENCY.

An insolvent engaged in a business supported by government contracts was largely indebted to a bank, and the cashier thereof, having knowledge of such facts, stated in reply to a request by plaintiff, who was contemplating selling goods on time to the insolvent, to enable him to continue business, that the contract of the insolvent was all right, and advised plaintiff to accept the insolvent's note, and stated that it would be paid.   The cashier afterwards made similar statements to plaintiff, both before and after the maturity of the note.   The continuance of the insolvent in the business was apparently the only manner in which the

bank could make its debt. *Held* sufficient to warrant the inference that the representations were made by the cashier for the benefit of the bank, as the plaintiff's action in acting on the representations would increase the assets of the insolvent.

**4. SAME—LIABILITY OF BANK.**
The misrepresentations by the cashier being for the purpose of increasing the assets of the bank's debtor, and thus to aid the bank in collecting its debt, the bank is liable for damages resulting to the plaintiff by reason of such misrepresentations, as the collection or securing of indebtedness due the bank is within the scope of the authority of the cashier.

**5. SAME.**
The fact that the sale of goods to the insolvent did not eventually result in any profit to the bank did not relieve it from liability for damages resulting from the misrepresentations of the cashier.

Appeal from trial term, Monroe county.

Action by William Taylor against the Commercial Bank. From a judgment of nonsuit in favor of the defendant, the plaintiff appeals. Reversed.

The action was commenced on the 1st day of December, 1898, to recover damages alleged to have been sustained by the plaintiff on account of false and fraudulent representations made by the defendant, by which the plaintiff was induced to sell to one Ligles F. Lighthouse, who was financially irresponsible, about $5,000 worth of leather, for which Lighthouse neglected to pay, and the plaintiff was unable to collect the value thereof.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

Charles J. Bissell, for appellant.
Walter S. Hubbell, for respondent.

McLENNAN, J. To properly appreciate the questions of law involved, the facts must be understood. A nonsuit having been granted, the plaintiff is entitled to the most favorable inferences deducible from the evidence, and all disputed facts are to be treated as established in his favor. Place v. Railroad Co., 167 N. Y. 345, 60 N. E. 632; McDonald v. Railway Co., 167 N. Y. 66, 60 N. E. 282. The facts which must be deemed established under the rule adverted to may be stated as follows: During all the times when the transactions hereinafter referred to occurred the defendant was a banking corporation, incorporated under the laws of this state, and was carrying on the business of banking at the city of Rochester, N. Y. For a period of five years, commencing in January, 1890, one Charles F. Pond was its cashier. In 1893 one Thomas F. Swanton was its teller, and became cashier in February, 1896, in the place of Pond. In 1893, at the time the alleged representations were made, one Lighthouse was engaged in the manufacture of mail bags for the United States government under a contract with it, was a regular customer of the defendant, and was its debtor to the amount of about $15,000 upon promissory notes made by him and indorsed by one Acker. At that time Lighthouse and Acker were insolvent, and considering the amount of the indebtedness, the state of their accounts, and the course of dealing

which they had with the bank, it might properly have been found that Pond knew that fact. In the early part of 1893, Lighthouse applied to the plaintiff, who was a manufacturer of leather at Lyons, N. Y., for the purchase of 2,000 sides of leather, of the value of about $5,000, in payment of which he offered a note made by him, and indorsed by Acker, and referred the plaintiff to the defendant bank for information as to his and the indorser's responsibility. Thereafter, and in April, 1893, the plaintiff called at the office of the defendant, saw Pond, the cashier, and stated, in substance, that he had been referred to the bank to ascertain as to the responsibility of Lighthouse. Pond thereupon told the plaintiff that the contract which Lighthouse had with the government was all right; to take the note; it would be good, and that he would get his pay. A day or two after the plaintiff again called at the bank, and Pond again said to him: "Take the note; the note is good, and you will get the pay." The plaintiff thereupon informed Pond that he would let Lighthouse have the leather. He did so, and took the $5,000 note, relying upon the representations made by Pond. The note was payable at the defendant bank. When it became due it was there deposited, but was not paid. The plaintiff or his representatives frequently called at the bank to ascertain the reason, and from time to time were informed that the note would be paid, and were urged not to attempt to enforce its collection. This continued until September, 1894, when Lighthouse executed a bill of sale of all his property and business to Thomas F. Swanton, defendant's teller, and said Acker. On the same day another instrument was executed by Swanton and Acker, by which it was agreed that the property and business transferred to them by Lighthouse should be managed in a manner specified; that all deposits should be made in the defendant bank; and that the profits of the business and proceeds of the property should first be applied in extinguishment of the indebtedness of Lighthouse to the bank and of Acker's liability as indorser. The agreement further provided that after such obligations were discharged the business should be restored to Lighthouse, or to any person designated by him, upon payment by him of a reasonable compensation to Swanton and Acker for the services rendered by them. It is apparent that these instruments were made and executed for, and solely in the interest of, the defendant. The business of Lighthouse, so conducted by Swanton and Acker, was not successful. No profits were realized, largely because of the fact that orders from the United States government for mail bags ceased, and the property and business was eventually disposed of in such manner that substantially nothing was realized by the defendant to apply upon the indebtedness of Lighthouse and Acker to it. The evidence very clearly shows that the success of Lighthouse's business depended almost entirely upon receiving orders from the government for mail bags under its contract with him, and that whether or not Lighthouse should be able to discharge his indebtedness to the bank depended wholly upon the success of such business. In order that the business should succeed, and to enable him to perform his contract with the

government, it was necessary for Lighthouse to obtain leather. This he did from the plaintiff in the manner indicated. A considerable portion of the leather sold by the plaintiff was on hand·in October, 1896, when Swanton and Acker closed out the business. After the bill of sale was executed in September, 1894, by Lighthouse to Swanton and Acker, the plaintiff took judgment against Lighthouse for the amount remaining unpaid on the leather, viz. $4,061.71. The judgment was duly docketed April 24, 1895. On December 20, 1895, an execution was issued thereon, and returned wholly unsatisfied, and no part of such judgment has been paid.

The whole evidence, of which the foregoing is but a brief synopsis, was sufficient to have supported findings by the jury to that effect, that the defendant's cashier represented to the plaintiff that Lighthouse and Acker were financially responsible, and that the note made by Lighthouse, and indorsed by Acker, was good, when in fact both were wholly irresponsible, and the note was worthless to the knowledge of the cashier; that the plaintiff sold his leather, and took the note therefor, relying solely upon the truth of the representations; that when the cashier made such representations he was acting for and on behalf of the defendant, and made them for the purpose of enabling Lighthouse to obtain plaintiff's property, to the end that Lighthouse might thereby continue in business, and realize therefrom sufficient to enable him to discharge his obligation to the bank, or some part thereof. The evidence of the plaintiff is positive that the representations were made; that he relied upon them, and parted with his property believing them to be true. That Lighthouse and Acker were insolvent at the time is hardly in dispute, and the inference is certainly deducible from the evidence that the cashier was aware of the fact. At all events, according to the plaintiff's testimony, he made a material representation assuming to have knowledge of the facts, and therefore the liability is precisely the same as if made with knowledge of its falsity. Bennett v. Judson, 21 N. Y. 238; Hubbard v. Briggs, 31 N. Y. 518; Kountse v. Kennedy, 147 N. Y. 124–130, 41 N. E. 414, 29 L. R. A. 360, 49 Am. St. Rep. 651; Hadcock v. Osmer, 153 N. Y. 604–608, 47 N. E. 923.

As bearing upon the other propositions, we find that Pond, who made the representations, was defendant's cashier,—was in charge of· the bank. In all ordinary transactions it spoke only through him. He was its executive officer, and had full power and authority to collect all debts due to the bank, and for that purpose to adopt such means as he deemed proper. Bridenbecker v. Lowell, 32 Barb. 9. By virtue of his general powers, he could certify checks or borrow money on behalf of the bank. Pope v. Bank,. 59 Barb. 226; Barnes v. Bank, 19 N. Y. 152. He could make a valid certification of a check when there were no funds in the bank to meet it, and although such act constituted a false representation. Farmers' & Mechanics' Bank v·. Butchers' & Drovers' Bank, 16 N. Y. 125, 131, 69 Am. Dec. 678. Presumably the cashier in this case was anxious to protect his principal's interests. Lighthouse's indebtedness to the bank was over $15,000, secured by

Acker's indorsement. Both were insolvent. Apparently the only way in which such indebtedness could be paid by Lighthouse was by furnishing mail bags to the government under his contract. He could not furnish the bags unless he obtained leather. Failure in that regard meant the loss to the bank of its debt. Within 15 months, and after the government contract finally fell through, the bank, in effect, took over to itself all the property and business of Lighthouse to protect its claim against him, and in the meantime sought to allay the fears of the plaintiff by repeatedly assuring him that his demand would be paid by means of the contract which it was expected his property would keep alive and make profitable. From these facts we think the inference was deducible that the representations were made by the cashier for the purpose and benefit of the bank, and to enable it to collect its indebtedness from Lighthouse.

It cannot be doubted that if the creditor of an insolvent debtor by false representations induced a third party to sell property to such debtor upon credit, for the purpose of enabling the creditor to make his debt, such third party may recover from the creditor the damages sustained. Direct proof of such purpose on the part of the creditor could seldom be made, but if the indebtedness was proven, and thus his interest established, and it were shown that he made false representations which he knew were to be relied upon, and which would induce the third party to transfer his property to the insolvent debtor, would not the inference be fairly deducible that the creditor made the representations for the purpose of benefiting himself? The intent is shown by the circumstances that the false representations were made with knowledge that they were to be acted upon, and that the result which would naturally follow would be beneficial to the person making them. The insolvent's estate would be increased, and thereby the chances of the creditor obtaining his debt would to that extent be improved.

We cannot discover why the same reasoning does not apply to the acts of the cashier, the representative of the defendant, in the case at bar. It was a part of his duty to collect or secure such obligations as were owing to the bank. While so engaged he was acting within the scope of his authority, and the bank was liable for his acts. The fact that the cashier employed improper means —did something which he was not authorized to do—can be of no importance if done in the regular course of his employment. If the cashier in the case at bar, for the purpose of inducing the plaintiff to accept the note in question, had said that the bank would guaranty the payment of the note, and the cashier had formally done so as an aid to the collection of its debt against Lighthouse, there could be no question as to the bank's liability upon such guaranty, notwithstanding the particular transaction was not authorized by its board of directors. This would be so because it was a part of the regular business of the cashier to collect or secure such indebtedness, and therefore all acts done in that regard would have been binding upon his principal, even although not expressly authorized. Instead of guarantying the note in question, and thus

inducing the plaintiff to accept it, the cashier made such representations as might properly have led the plaintiff to regard such guaranty as unnecessary, and to accept the note as it was. Thereby the same result was accomplished, the note was accepted, the plaintiff parted with his property, and the assets of the bank's debtor were to that extent increased.

It is a most monstrous proposition that the cashier of a bank,—the person who has charge of its daily transactions,—who, as to the general public, is its sole representative, may, by false and fraudulent representations, induce third parties to sell their property upon credit to insolvent debtors of the bank, and thus enable it to secure such indebtedness without incurring any liability to the parties to whom such representations are made. It can be of no importance that, as it eventually transpired, no profit resulted from the transaction to the bank. At the time the representations were made, and the plaintiff's property to the amount of $5,000 was turned over to Lighthouse, the financial standing of the bank's debtor was to that extent improved. It in effect received additional security for the debt which was owing to it, and if judgment had been recovered by the bank against Lighthouse, and execution issued thereon, as it might have been, substantially the entire value of the property sold by the plaintiff would have been applied upon such judgment.

The act on the part of the cashier which is complained of constituted a tort, and it is not claimed that the bank authorized, justified, or knew of it; but that is entirely immaterial, if it was done in the regular course of his employment.

In Nowac v. Railway Co., 166 N. Y. 433, 440, 60 N. E. 32, 34, the rule is stated as follows:

"We have the general rule that a principal is liable to a third person in a civil action for the fraud or other malfeasance of his agent, perpetrated by the latter in the course of his employment, although the act was ultra vires, and the principal did not authorize, justify, or know of it."

In the case of Mackay v. Bank, L. R. 5 P. C. 394, the court said:

"The master is answerable for every such wrong by his servant or agent as is committed in the course of the service and for the master's benefit, though no express command or privity of the master be proved, and there is no distinction between a case of fraud and a case of any other wrong."

Attention has been called to a large number of cases by the able counsel for the respective parties, which bear more or less directly upon the questions involved; but, without discussing such cases in detail, it may be said that none of them are authority for the proposition that a principal is not liable for the false representations made by its agent, which were relied upon by and resulted in damage to a third party, made under circumstances such as are disclosed by the evidence in this case.

Assuming that the evidence may properly be interpreted as above indicated, to wit, that the defendant's cashier, while acting within the scope of his authority, and for the purpose of enabling it to collect or secure a debt owing to it, made representations as to material facts which he knew to be false, or assumed to have pos-

itive knowledge of such facts, when, as matter of fact, he did not, and thereby induced the plaintiff to sell his property upon credit to such debtor, to his damage, we think the authorities are uniform in holding that the principal is liable for such wrongful act of its agent, although done without its authority or knowledge. We do not intend to intimate that the conclusions of fact indicated should be found by a jury upon the evidence in this case, but have simply intended to point out that in our opinion the evidence is of a character to raise an issue of fact as to the several propositions referred to, and such as should be passed upon by a jury. It follows that the judgment appealed from should be reversed, and a new trial granted, with costs to the appellant to abide event.

Judgment reversed, and new trial ordered, with costs to the appellant to abide event.

SPRING and WILLIAMS, JJ., concur. HISCOCK, J., concurs in result. ADAMS, P. J., not voting.