ARMSTRONG v. CHEMICAL NAT. BANK OF CITY OF NEW YORK.

(Circuit Court of Appeals, Sixth Circuit. December 7, 1897.)

No. 473.

1. NATIONAL BANKS — AUTHORITY OF OFFICERS TO BORROW MONEY — USAGE BETWEEN BANKS.

The rule announced in Western National Bank v. Armstrong, 14 Sup. Ct. 572, 152 U. S. 346, that the vice president or cashier of a national bank has no power to borrow money on its behalf unless specially authorized by the directors, is not applicable in a case where a general and long-established usage is shown between corresponding banks, prevailing in both cities where the

lending and borrowing banks were respectively situated, of lending and borrowing through the executive officers of the banks, no further authority being furnished or demanded; the presumption being that such usage was known and acquiesced in by the directors of the borrowing bank, in the absence of notice to the contrary to its correspondents.

**2. SAME—IMPLIED AUTHORITY FROM DIRECTORS.**

The vice president of a national bank was engaged in outside speculations, to which the cashier and teller were privy, and in which funds of the bank were used. All were directors. Two of the remaining six directors were employés of the vice president, whom he had qualified to act by gifts of stock, and the remainder were selected by him for the purpose of giving him full control and management of the bank, which he exercised, borrowing money and pledging the securities of the bank therefor, and using large amounts of its funds and securities in his speculations, to the knowledge of a minority of the directors, and without inquiry or investigation on the part of any. *Held*, that such knowledge and conduct on the part of the directors gave implied authority to the vice president to borrow money on behalf of the bank.

**3. SAME—RATIFICATION—PASSING OF CURRENT ACCOUNTS.**

Where, by usage between two correspondent banks, one rendered a monthly statement to the other, which returned a reconcilement sheet noting any matter of difference, which was settled by correspondence, such a statement, showing a loan by the bank making it to the other, was notice of such loan to the directors of the latter; and a failure to notice or object to it was a ratification, though in fact the books of the borrowing bank showed the transaction to have been a deposit to its credit by its vice president, and the amount was credited to his individual account and used by him, the discrepancy having been overlooked by the bookkeepers who checked the statement. In such case, the negligence of the employés was chargeable to the directors, whose agents they were.

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

Bill by the Chemical National Bank of City of New York against David Armstrong, receiver of the Fidelity National Bank. From a decree allowing the claim of the complainant (76 Fed. 339), the defendant appeals.

The bill in the circuit court was exhibited by the Chemical National Bank of New York City against David Armstrong, receiver of the Fidelity National Bank, to compel the allowance of a claim of $300,000, with interest, for a loan alleged to have been made by the Chemical Bank to the Fidelity Bank on March 2, 1887. In his amended answer the receiver denied that the Fidelity Bank had incurred the obligation, as alleged, or had received the proceeds thereof, but averred that its vice president, E. L. Harper, and its cashier, Ammi Baldwin, in pretending to bind the Fidelity Bank thereto, had acted fraudulently and without authority of its directors, and in furtherance of a fraudulent scheme, by which the proceeds of the alleged loan were all appropriated to the use of Harper, and that all this was without the knowledge of the bank or its directors. It was conceded that a large amount of collateral had been deposited to secure payment of the loan. At the original hearings in the circuit court, and in this court, the question of Harper's and Baldwin's authority to bind the Fidelity Bank was but little discussed, although made both upon the pleadings and in the assignments of error. It was disposed of in a single sentence against the contention of the receiver in the first opinion in this court. The main question there considered was whether the Chemical Bank was obliged to reduce its claim by the proceeds of collateral held to secure the debt, and collected after the declared insolvency and before the filing of proof. This court, reversing the circuit court, held that no such deduction need be made, but that the claim must be allowed in full for the principal and interest due and unpaid at the date of the declared insolvency. 16 U. S. App. 465, 8 C. C. A. 155, and 59 Fed. 372. A motion for rehearing was made by the Chemical National Bank on a subordinate question as to the interest to be allowed on delayed

dividends. Pending the motion, the supreme court of the United States announced its opinion in the case of Western Nat. Bank v. Armstrong, 152 U. S. 346, 14 Sup. Ct. 572, in which it was held that "the borrowing of money by a national bank, though not illegal, was so much out of the course of ordinary and legitimate banking business as to require those making the loan to see to it that the officer or agent acting for the bank had special authority to borrow money," and that where no special authority appeared, and no ratification of the unauthorized act was shown, the bank was not liable. Thereupon, while the case on rehearing was still before this court, Armstrong also made a motion for rehearing on the issue whether the Fidelity Bank was liable for the alleged loan. A rehearing was granted and had, and the following order was made: "That the decree of the circuit court is reversed, with leave to the parties to adduce further evidence upon the issue whether the Fidelity Bank owes anything to the Chemical Bank by virtue of the alleged loan; that, if the issue is decided in favor of the receiver, the bill shall be dismissed, and a decree entered in favor of the receiver for the restitution of the $100,000 paid by the receiver on July 25, 1892, to the Chemical Bank on the faith of the decree of the court below; that, if the liability of the Fidelity Bank for the loan is established, a decree shall be entered directing the receiver to allow the claim for $305,450 (being the amount of the loan and interest to the date of the declared insolvency, June 21, 1887)," and to pay the dividends accrued and accruing thereon, with interest on delayed dividends, taking credit for the $100,000 already paid, on the principle ordinarily applied in partial payments. 31 U. S. App. 75, 13 C. C. A. 47, and 65 Fed. 573. New evidence was accordingly adduced in the circuit court by both parties, and, upon the whole record, the circuit court held the Fidelity Bank liable for the loan, and thereupon entered a decree against the receiver in accord with the mandate of this court, for the allowance of the claim for $305,450, and for the payment, by way of dividends and interest, after crediting the $100,000 paid July 25, 1892 (referred to above), of $117,749.58, with interest from October 21, 1896. The opinion of Judge Sage, who presided in the circuit court, is reported in 76 Fed. 339.

The facts disclosed by the record are as follows:

On February 28, 1887, Harper, vice president of the Fidelity Bank, mailed at Cincinnati, to the cashier of the Chemical Bank, in New York, a letter, of which the following is a copy:

"Briggs Swift, President. E. L. Harper, Vice President. Ammi Baldwin, Cashier. Benjamin E. Hopkins, Ass't Cashier.

"United States Depository. The Fidelity National Bank.

"Cincinnati, February 28, 1887.

"Wm. J. Quinlan, Jr., Cashier Chemical National Bank, New York City— Dear Sir: Inclosed herewith we hand you for credit our certificate of deposit No. 345, for $300,000, with bills as collateral, as follows: [Then was set out a list of twenty-seven notes, aggregating $326,000.] We desire to keep a large reserve with you, and we trust you will make the rate as low as you proposed some time since. Please place the amount to our credit, and advise the rate.

"Respectfully, yours,        E. L. Harper, Vice President."

The certificate of deposit inclosed was as follows:

"The Fidelity National Bank.

"E. L. Harper has deposited in this bank three hundred thousand ($300,000), payable to the order of himself on return of this certificate, in current funds.

"$300,000.        Ammi Baldwin, Cashier."

Indorsed: "E. L. Harper."

This letter of February 28th was not copied into the letterpress copy books of the Fidelity Bank, and the stub of certificate of deposit was marked "Canceled." Of the collateral bills receivable sent, 19 pieces, aggregating $146,-169.29, par value, were the property of the Fidelity Bank, and the remainder, aggregating $180,000, were mere accommodation paper procured by Harper, and not appearing on the books of the Fidelity Bank. The letter reached New York on March 2d, and upon that day Quinlan, cashier of the Chemical Bank, wrote and mailed the following letter:

"New York, March 2, 1887.

"A. Baldwin, Esquire, Cashier—Dear Sir: Your favor of the 28th inst. has been received. We credit Fidelity National Bank $300,000, and shall be considerate as to rate of interest when the loan is paid. ＊ ＊ ＊

"Wm. J. Quinlan, Jr., Cashier."

Upon the books of the Chemical Bank was entered, on March 2d, this credit in favor of the Fidelity Bank: "Fidelity Temp. Loans, $300,000."

Upon the 2d of March, two days before Harper could have received the answer, he directed Watters, the general bookkeeper of the bank, to credit his (Harper's) individual account with $300,000, and to charge the Chemical Bank with the same on account of "transfer of funds." These two entries, taken together, meant that Harper had deposited $300,000 in the Chemical Bank to the credit of the Fidelity Bank, and that the same had been carried to his individual credit on the books of the latter bank.

On May 19th the following telegram was sent to the Chemical Bank:

"Cincinnati, May 19, 1887.

"To Chemical National Bank, New York: We send other bills to take place. Will want all returned here without presenting, as we advised parties to arrange payment here. Fidelity National Bank."

On May 20th Harper wrote and mailed the following letter:

"May 20, 1887.

"William J. Quinlan, Jr., Cashier, New York—Dear Sir: Please do not present any of the collateral paper for payment. We have advised parties we would order back and charge up here. We will to-morrow send you new notes to take place of ones maturing. We will pay the loan July 15th, and will pay interest till that date, if agreeable to you.

"Yours, truly, E. L. Harper, V. P."

On May 21st Harper wrote and mailed the following letter:

"Cincinnati, May 21, 1887.

"Chemical National Bank, New York City—Gentlemen: Inclosed herewith we hand you to hold as collateral the following bills· [Then follows a list of twenty-one notes, aggregating $230,592.46.] Will you kindly return to me the following: [Then follows a list of nineteen notes of those forwarded in his letter of February 28th.] We will pay the loan July 15, 1887, if agreeable to you, and will pay interest now to that date. E. L. Harper, Vice President."

"Respectfully yours, E. L. Harper, Vice President."

The substitution of collateral was effected in accordance with Harper's request. Nothing was paid on the loan, and nothing collected by the Chemical Bank on the collateral, until after the suspension of the Fidelity Bank. There is affirmative evidence that three or four of the nine directors had no actual knowledge of this loan. And there is no evidence that any of the other directors had knowledge of it except Harper and Baldwin, and probably Hopkins, the assistant cashier, who were all directors.

The Chemical Bank based its contention that the Fidelity Bank was liable for this loan on several grounds: First, that it was the custom in New York and Cincinnati for banks to borrow money one from another, and that the executive officers of the bank—the president, the vice president, and the cashier, or either of them—were, by custom, regarded as having authority to contract such loans; second, that the directors of the Fidelity Bank had entirely abandoned to Harper the direction and management of the affairs of the bank, and thereby conferred upon him all necessary authority to do what they might do; third, that the Fidelity Bank had full notice of the loan nearly three months before the suspension, and, by failure to repudiate it, ratified it; fourth, that the Fidelity Bank received the money and used it in its legitimate business, and is liable therefor as for money had and received.

It is convenient to state the facts of the case under these four heads:

First. Upon the question of custom seven witnesses were called from New York City and six from Cincinnati by the complainant and appellee.

William J. Quinlan, cashier of the Chemical National Bank since 1878, testified that, prior to the decision in the Western Bank Case, it was a very usual thing

for a national bank to borrow money; that the officer who acted for the bank was either the president, vice president, cashier, or assistant cashier; that never, in the many years during which the custom prevailed, had the lending bank demanded proof of the authority of the borrowing officer in the form of a resolution of the board of directors; that the loans so made were in amounts large and small, and that the loans were made either upon certificates of deposit, made payable to the lending bank or indorsed in blank, or merely upon request by letter; that collateral was usually required to the amount of the loan, in the shape of bills receivable.

George G. Williams, president of the Chemical Bank since 1878, and connected with it for 40 years as discount clerk, paying teller, cashier, and president, and for many years connected with the New York Clearing House, testified that it was usual for one bank to borrow money of another before the Western Bank decision; that it was done by a rediscount of its bills receivable, by its own note secured by collateral, or by a certificate of deposit; that the borrowing bank was represented in the transaction by the president, vice president, or cashier, or other executive officer who was authorized to sign drafts and letters for the bank, and that, before the decision in the Western Bank Case, the lending bank never required any evidence from the board of directors as to the authority of the borrowing officer, because the New York decisions were express to the point that it was not necessary; that his own bank did not borrow money, but that he had had a long experience in lending money for his bank to other banks.

Dumont Clarke, president of the American Exchange National Bank for two years, and connected with it for 30 years as assistant cashier, cashier, and vice president, testified that prior to the decision in the Western Bank Case it was a very common occurrence for one bank to borrow of another; that the cashier, or the president, or one of the officers, acted for the borrowing bank; that the lending bank never required proof of special authority granted to the borrowing officer by his board of directors; that the loan was made either by a rediscount of bills receivable or by a note of the borrowing bank, with collateral, or by a certificate of deposit, with collateral; that he knew the custom from the course in his own bank and by information as to the course in other banks; that his bank never borrowed money.

A. B. Hepburn, president of the Third National Bank for two years and a half, comptroller of the currency for several years, national bank examiner for three years, and superintendent of the New York state bank department for four years, testified that it was a usual thing for banks to borrow money from other banks prior to the decision in the Western Bank Case; that either of the executive officers—the president, vice president, cashier, or assistant cashier—acted for the borrowing bank in such transactions; that the lending bank never required any proof as to authority of the borrowing officer, but relied on the genuineness of his signature to the application and correspondence, and protected itself by passing the money to the credit of the borrowing bank upon the books of the lending bank, so that it could only be drawn out by the checks of the officers in the regular course of business; that he never knew of an instance where the lending bank required a grant of special authority by the board of directors of the borrowing bank to the borrowing officer; that the form of the loan was usually either a direct rediscount of bills receivable, with a margin of 20 or 25 per cent., or a note, with the bills as collateral, or a certificate of deposit; that loans were sometimes made on the unsecured note of the borrowing bank.

Edward Townsend, cashier of the Importers' & Traders' National Bank for 15 years, testified that it was usual for one bank to borrow money of another; that any official, whose signature was authorized with the lending bank, acted for the borrowing bank; that never, prior to the decision in the Western Bank Case, did the lending bank require a resolution of the board of directors of the borrowing bank; that the loan was effected either by rediscount of bills receivable or by a note, with collateral, or by certificate of deposit; that no change had taken place in the practice of his bank since the Western Bank decision.

George F. Baker, president, cashier, and teller of the First National Bank for 30 years, testified that it was a usual thing for a bank to borrow money from its correspondent bank; that any of its executive officers acted for the

growing bank; that no resolution of the directors evidencing the officer's authority to borrow the money was ever required before the Western Bank decision, but that such a resolution is now generally required; that the witness' own bank had litigation with the receiver over a loan made by it to the Fidelity through Harper.

Frederick D. Tappan, for 27 years president of the Gallatin National Bank, and connected with that bank for 45 years, testified that it was a usual thing for a bank to borrow of its correspondent bank; that the president, the vice president, or the cashier acted for the borrowing bank; that the lending bank never required any special authority from the board of directors of the borrowing bank prior to the Western Bank decision; that the loans were usually evidenced by notes, with security attached, and sometimes by a certificate of deposit; that ever since the Western Bank decision no change had occurred in the custom in witness' bank, and that collateral on such loans was not always required.

The first of the Cincinnati witnesses was M. M. White, who had been president of the Fourth National Bank of Cincinnati for 15 years, and cashier for 6 years prior to that. He testified that it was a usual occurrence, and regarded as legitimate in the line of banking business, for one bank to borrow money of another; that never, until the decision of the Western Bank Case, had the authority of the executive officer of the bank—the president, vice president, or cashier—to convey the liability of the bank upon his signature in borrowing money from another bank ever been questioned among Cincinnati banks, but that since the Western Bank decision many banks had required a resolution of the directors of the borrowing bank before making a loan; that it was an extraordinary thing for a banker in Cincinnati to borrow from $300,000 to $500,000 for his bank; that where a bank is short of money and long in bills, as frequently occurs, it was legitimate and proper, and not an unusual thing, for a bank to rediscount freely and build up its cash; that the witness' bank had once borrowed $75,000 for such a purpose; that it was reported to the directors, and all such transactions should be reported by the acting officers to the directors.

W. A. Goodman, 20 years a banker, and president of the Lafayette National Bank, testified that it was not a very unusual or extraordinary thing for a bank to borrow of its correspondent; that it was rather unusual, but was done frequently, though the witness' bank never did it; that witness' bank had not many country correspondents; that in making loans by rediscounting their paper no resolution of their board of directors was required; that he never had an application by a bank to borrow money on its own name, but that on such an application he would have required a resolution from the board of directors.

W. S. Rowe, cashier of the First National Bank, testified that before the decision of the Western Bank Case it was considered within the scope of the duties of a cashier to borrow money for his bank; that the country banks often borrowed money; that it was generally done by correspondence; that the letter would be signed by either the president, vice president, or cashier; that it was done either by rediscounting or by a direct note, signed by an executive officer of the bank, and that a resolution of the directors was never required; that the witness' bank had loaned as much as $150,000 to a country bank on bonds and securities; that the bank of Goodman, the last witness, did only a local business, and lent little or nothing to country banks; that such loans were always reported to the directors of the lending bank; that by country banks witness meant banks in the small cities in the agricultural districts, where, when crops were to be moved, more money was needed than they had; that witness would not regard it as good banking for an officer of a bank to borrow $300,000 without consulting his directors; that witness' bank did not borrow money.

H. C. Yergason, president of the Merchants' National Bank, testified that his bank had occasionally made loans to country banks, but had never required any authority from the directors, and had deemed the authority of the executive officer sufficient; that his bank had occasionally borrowed money, but the directors had always been consulted before doing so.

Griffith P. Griffith, vice president of the Citizens' National Bank, testified that he had been vice president and cashier of his bank 15 years; that he had been assistant cashier of the First National Bank from 1863 to 1866, and cashier of the Third National Bank from 1867 to 1880; that it was a usual thing for

83 F.—36

banks to borrow money of their correspondent banks when applied for either by the president, the vice president, or the cashier of the borrowing banks, and that no proof of any special authority from directors was demanded from such officers; that the loans were made almost entirely by correspondence, and the proceeds of the loan were credited on the books of the lending bank to the borrowing bank; that the loans were made either by rediscount or by direct loans, with bonds or good securities; that banks with which he had been connected had not been in the habit of borrowing money; that witness would not hesitate to rediscount bills without consulting his directors, if there was a run on the bank.

J. D. Hearne, president of the Third National Bank of Cincinnati, and former president of the Covington City Bank, testified that it was an ordinary thing for one bank to borrow of another, and that prior to the decision in the Western Bank Case it was not customary for the lending bank to require from the borrowing bank a resolution from the board of directors; that the executive officers of the borrowing bank acted for it in the transaction; that no proof was required of special authority in those officers; that it was regarded as falling within the scope of the duties of cashier, president, or vice president to borrow money on behalf of his bank from another bank; that loans were made by a rediscounting and by direct loans, with bills receivable, or other collateral; that sums lent by his bank to other banks were usually not large; that witness had borrowed money in large sums for his banks; that he always consulted his directors before borrowing; that he never advised the lending bank in such cases of the approval of his board of directors, because it was never requested; that since the decision in the Western Bank Case the custom had changed, both in his bank and in other banks with whose mode of business he was familiar, and that a resolution of the board of directors is now required by them before lending money to a bank.

No witnesses upon the subject of custom were called by the receiver.

Second. E. L. Harper was a director, Ammi Baldwin was cashier, and Benjamin Hopkins was teller of the Third National Bank. While occupying these positions they had been engaged together in wheat gambling, and had been charged with misconduct in the management of that bank in connection with the gambling. In February, 1886, Harper and others organized the Fidelity Bank, and the bank opened for business March 1st. Harper took more than one-quarter of the stock. He was elected vice president; Baldwin, cashier; and Hopkins, assistant cashier. Shortly after organization a committee of the directors investigated the charges concerning Harper, Baldwin, and Hopkins, made by Hearne, then president of the Third National Bank, but the directors declined to hear the report. Alter, a director, who wished to read the report, made himself still more obnoxious by asking to see the call loan account, but access to it was denied him. The directors held four meetings in 1886,—one in February, to elect officers; the second in May, to appoint a committee to draft by-laws; the third in August, to approve the by-laws; and the fourth a special meeting, to vote a dividend. No other business was done by the directors during that year, and Harper managed the bank without the slightest supervision of any kind. At the annual election Alter was dropped as a director, and, of the nine elected, Harper, Baldwin, and Hopkins, Mathews, Harper's brother-in-law, and Gahr, his confidential secretary, constituted a majority. Mathews and Gahr were, confessedly, Harper's puppets in the board. He gave them 10 shares each to qualify them, and then each also held a large amount of stock in his name which belonged to Harper. Mathews was first elected in February, 1886, and resigned to allow some one else to be elected in his place. He was re-elected in January, 1887, to take the place of Alter, and remained in the board to the end. The explanation of his position in the board, and of that of Gahr, is seen by the following question and answer: "Q. Mr. Mathews, you said something a little while ago off the record, which did not go down in the stenographic report,—something about your directorship being nominal. Will you explain what you meant by that? A. Yes, sir. It was understood between Mr. Harper and me,—and I think the same is true as to Mr. Gahr,—that we were to be directors only until others were found to take our places; and, in explanation, I will say that one time Mr. Harper told us that one of us would have to step out,—that one of us would have to resign as director to allow somebody else to supply the place,—and I know Mr. Gahr and I tossed coppers

to see which of us would withdraw." Mathews was not only Harper's brother-in-law, but he was one of the executive officers of Harper's corporations,—the Riverside Rolling-Mill Company, Swift's Iron & Steel Works, and E. L. Harper & Co. In January, 1887, Harper and Hopkins entered upon a comprehensive scheme of wheat gambling, and Baldwin was accessory thereto. In carrying out their plan, Harper raised money by discounting, with the funds of the bank, the paper of E. L. Harper & Co., Swift's Iron & Steel Works, and the Riverside Rolling-Mill Company, in all of which companies he was the controlling member, and also by cashing the checks of these companies, and carrying the checks as cash on the books of the bank. This was done with the knowledge and connivance of Mathews, the director. In these ways Harper consumed of the money of the bank, between January and June, $750,000. The daily discounts were recorded in a book, which was open to the inspection of the directors. Kineon, one of the directors, repeatedly called the attention of Swift, the president, to the large discounts in favor of Harper's companies, and objected to it. Swift reported the matter to Harper, who said that if Kineon ran the bank he would keep all the money in the bank. Swift called Kineon's attention to Harper's large credits, and Kineon wanted to know where he got them. No further investigation or inquiry was made, however, until Kineon's resignation, hereafter described.

Harper's brokers in the wheat deal were Wilshire, Eckert & Co. He advanced, from the funds of the bank to that firm, on their notes and by cashing their checks and carrying the same in cash, a million and a half dollars, to be expended for his benefit in buying wheat on the Chicago market. He advanced, from the funds of the bank, by way of discounts, to Whitely, Fassler & Kelly, a firm who were interested in the wheat deal, $375,000. He borrowed in February and March, 1887, in the name of the Fidelity Bank, from the first National Bank of New York, $400,000, used $113,000 of the Fidelity Bank's bills receivable in so doing, and had $400,000 transferred to his credit on the books of the Fidelity Bank, without exhibiting any written evidences of his right to such credit. He borrowed, in the name of the Fidelity Bank, from the Chemical Bank, the $300,000 here in controversy, in March, 1887, and forwarded as security $146,000 of the bills receivable of the Fidelity Bank. In June, 1887, in order to tide over the stress in which the bank then was, he borrowed from the Chemical Bank about $1,000,000, and transferred to that bank bills receivable of a greater value. He did this without any action by the board of directors. During this period of less than six months, over which these transactions extended, the board of directors held five meetings,—one meeting in January, to elect officers; another in February, to approve of Harper's purchase of $340,000 in government bonds to qualify the bank as a United States government depository. These bonds were bought from the First National Bank of New York, and as part of the contract of purchase that bank agreed to lend the $400,000 already spoken of, but it does not appear that this was known to the directors. The third meeting was held in March, to declare a dividend; the fourth in March, to vote an increase of stock; and the last in May, when Kineon, a director, demanded that the bills receivable be examined. Harper objected, and told Kineon he ought to resign. Kineon said he would if Harper would buy his stock, which Harper then did. A committee of directors was then appointed to examine the bills receivable, but no record is made of its reporting. No other business was done by the directors than has been stated.

The by-laws of the bank provided for monthly meetings, but during the year 1886 five meetings failed for want of a quorum. The by-laws provided that the president, vice president, and cashier should have power to discount and purchase bills, notes, and other evidences of indebtedness, and to buy and sell bills of exchange, and to sign all contracts, drafts, and checks. The cashier was made responsible for all the moneys, funds, and valuables of the bank, and was required to deliver the same to the order of the directors. The president and vice president were made responsible for all sums of money and property intrusted to them or placed in their hands by the cashier. The last by-law expressly forbade the carrying of checks or other memoranda as cash, but required them to be entered upon the books as call loans. In spite of this, Mathews, one director, was privy to the carrying of $400,000 for several months in this way for Harper's accommodation. The president, Briggs Swift, and

Chatfield and Moorehead, directors, were also accommodated in this way. Watters, the general bookkeeper, testifies that from the beginning to the end of the bank the entries of cash upon the book were false, because of these so-called cash items; and Hinsch, the assistant receiving teller, testifies that nothing was carried as a cash item except upon Harper's order.

Armstrong, the receiver, filed a bill against the directors to recover compensation· for the loss occasioned and made possible by their negligence and failure to supervise Harper's control of the bank. He charged them therein with liability for losses arising from excessive loans made by the banks to Wilshire, Eckert & Co., to Harper's companies, and to Whitely, Fassler & Kelly. He also charged them with permitting Harper, by their negligence, to embezzle more than $500,000, and, from the evidence adduced in support of the averment, it is clear that this charge reꞁeꞁꞁed to the transfer of funds by Harper, to his credit, of $700,000, at the times when he had ,obtained the loans from the First National Bank and the Chemical National Bank of New York. The solvent directors compromised the suit by paying the receiver $450,000, of which Swift, the president, paid $300,000; Chatfield, one director, $100,000; and Pogue & Zimmerman, the remaining $50,000. Watters, the general bookkeeper, testified that Harper controlled all the affairs of the bank; that no one else attempted to supervise his action in this regard; and that the directors permitted him to run the bank as he thought best. Kineon, director, testified that "Harper did everything; he ran the whole bank"; and that the directors were aware of this. Hinsch, the ˙assistant receiving teller, testified that Harper dictated as to all the operations of the bank.

Armstrong, the receiver, in his bill against the directors, said: "And complainant further avers that the said E. L. Harper, vice president of said association, was permitted by the said directors of said bank to manage the affairs of said banking association, and to have charge and control of its moneys and assets, without any investigation or control of his management of the business of said banking association." Again, the bill averred as follows: "Complainant further says that the said E. L. Harper, in connection˙ with the said Ammi Baldwin and Benjamin E. Hopkins, had been theretofore, and for many years prior to the transactions in this petition alleged, engaged in excessive and reckless speculations in wheat and other commodities, and were well known to the president and directors of said association to be excessive and reckless speculators, and wholly unfit to have the charge, management, and control of the moneys, assets, and affairs of the said the Fidelity National Banking Association; and complainant avers that by reason of said facts, and the knowledge thereof, the said president and directors were put upon inquiry as to the management of the affairs of said banking association, and the safe-keeping and investment of its moneys and other properties, during the whole time during which the money of said association was being loaned and embezzled and misappropriated, as hereinbefore set forth, yet the said president and the said directors, and each of them, in gross and willful disregard of their duty as such directors, wholly failed to exercise the slightest diligence or ·make the slightest investigation of the conduct of the business of said bank; and that any investigation of the affairs of said bank, or examination of its books and of the evidences of indebtedness held by said bank, would have disclosed to the said president, or either of said directors, that the moneys of said bank were being loaned, and liabilities to said bank were being contracted, in violation of the law, and that the affairs of said bank were being mismanaged, and its moneys and assets were being embezzled and misappropriated, in the manner hereinbefore set forth; and that the exercise of proper care and diligence in the discharge of their duty as president and as such directors would have prevented the losses described to said banking association."

Third. The Chemical Bank was the reserve agent and correspondent of the Fidelity Bank from its organization to its suspension, and the latter kept a regular deposit with the former. At the end of each month the Chemical Bank transmitted to˙ the Fidelity Bank an account current, showing the debits and credits for the month as taken from its ledger account. This account current was compared by the bookkeepers of the Fidelity with the books of the Fidelity, and the differences noted on what was called a "reconcilement sheet," which was returned to the Chemical Bank, where the differences. were examined, and correspondence,· with explanations, . ensued. . Upon. April 1st. the Chem-

ical Bank sent an account current for the month of March, in which the Fidelity appears credited, as of date March 2, 1887, "Temp. Loan, $300,000." The bookkeepers of the Fidelity Bank negligently overlooked the discrepancy between the account current of the Chemical Bank and their own books as to this item, in that in the account it appeared as a temporary or call loan from the Chemical to the Fidelity Bank, while on their books it appeared, not as the proceeds of the obligation of the bank, but only as a deposit by Harper in the Chemical Bank to the credit of the Fidelity Bank. Accounts current and reconcilement sheets passed between the two banks on April 1st, May 1st, and June 1st. In June, 1887, the Chemical Bank advanced $1,000,000 to the Fidelity Bank as a loan, by way of overdrafts, and received notes as collateral exceeding in value the amount. The validity of the loan has never been disputed by the receiver. The circumstances under which it was made do not appear in the record, though the minutes fail to show that it was ever authorized by resolution of the directors. The Chemical Bank paid itself the $1,000,000 out of the collateral, after the suspension of the Fidelity Bank, and sought to use the surplus remaining for payment of the $300,000 loan, claiming that all the collateral held by it was equally applicable to both debts. The receiver, though not at that time denying the liability of the Fidelity Bank on the $300,000 loan, disputed the right of the Chemical Bank to "mass" the collateral, and contended that only the collateral deposited with each obligation could be applied to it. In an equity suit in the United States circuit court of New York this issue was decided in favor of the receiver.

Fourth. The $300,000 credit of March 2, 1887, in the Chemical Bank, was drawn against by the Fidelity Bank in the usual course of business, and went to pay concededly legitimate obligations of the latter bank. It was all drawn out before April 1, 1887. Harper's account, including the transfer of $300,000 to his credit, was largely overdrawn when the Fidelity Bank went into the hands of the receiver, June 21, 1887.

John W. Herron, for appellant.

William Worthington and George H. Yeoman, for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge (after stating the facts). Can the case before us be distinguished on any satisfactory grounds from that of Western National Bank v. Armstrong, 152 U. S. 346, 14 Sup. Ct. 572? If not, the decree of the circuit court must be reversed.

In the Western Bank Case it appeared that by a letter of May 16, 1887, Harper asked for a loan from the Western Bank of $200,000, and inclosed four notes, for $50,000 each, due in four months, signed by A. P. Gahr, and indorsed by Harper, and secured by 1,600 shares of Fidelity Bank stock. The letter, though written on a letter head of the Fidelity Bank, was signed by Harper in his own name, without any official designation, but contained a request that the proceeds of the loan be put to the credit of the Fidelity Bank on the books of the Western Bank. This credit was, in a short time, exhausted by drafts drawn in the name of the Fidelity Bank, and signed, some of them by Hopkins, the assistant cashier, and the remainder by Harper himself. The money thus drawn was appropriated by Harper to his own use, and never came into the actual possession or use of the Fidelity Bank, and was not applied in any way for its benefit. There was evidence that Harper was vice president and general manager of the business of the Fidelity Bank.

The only question argued by counsel in the supreme court was whether Harper and Jordan, who made the loan for the Western

Bank, intended a loan to Harper or to the Fidelity Bank. The supreme court based its decision upon a ground not advanced or discussed, and held that, even if Harper intended to bind his bank by this loan, he had no general authority, as its vice president and principal executive officer, to do so, and that the record did not show any special authority conferred by the directors upon him for the purpose. The court further held that there was no evidence of a subsequent ratification of the loan by the directors, or of a receipt of the proceeds by the bank to its use and benefit. Upon the question of the power of Harper and the directors, the court, speaking by Mr. Justice Shiras, used the following language:

"The most that can be claimed in this case is that Harper acted as the principal executive officer of the bank. It cannot be pretended that, as such, he had power, without authority from the board, to bind the bank by borrowing $200,000 at four months' time. It might even be questioned whether such a transaction would be within the power of the board of directors. The powers expressly granted are stated in the eighth section of the national bank act (Rev. St. § 5136, par. 7): 'A national bank can exercise, by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange and other evidences of debt; by receiving deposits; by buying and selling exchange, coin and bullion; by loaning money on personal security, and by obtaining, issuing and circulating notes.' The power to borrow money or to give notes is not expressly given by the act. The business of the bank is to lend, not to borrow, money; to discount the notes of others, not to get its own notes discounted. Still, as was said by this court in the case of First Nat. Bank v. National Exch. Bank, 92 U. S. 122, 127, 'authority is thus given in the act to transact such a banking business as is specified, and all incidental powers necessary to carry it on are granted. These powers are such as are required to meet all the legitimate demands of the authorized business, and to enable a bank to conduct its affairs, within the general scope of its charter, safely and prudently. This necessarily implies the right of a bank to incur liabilities in the regular course of its business, as well as to become the creditor of others.' Nor do we doubt that a bank, in certain circumstances, may become a temporary borrower of money. Yet such transactions would be so much out of the course of ordinary and legitimate banking as to require those making the loan to see to it that the officer or agent acting for the bank had special authority to borrow money. Even, therefore, if it be conceded that it was within the power of the board of directors of the Fidelity National Bank to borrow $200,000 on time, it is yet obvious that the vice president, however general his powers, could not exercise such a power unless specially authorized so to do, and it is equally obvious that persons dealing with the bank are presumed to know the extent of the general powers of the officers."

The reasoning of the court is here based upon two propositions: First, that the borrowing of money by a bank is not within the ordinary business of the bank; and, second, that because it is of an extraordinary character, it is not within the scope of the power of the chief executive officer of the bank, without special authority conferred by the governing body of the bank,—the board of directors. The court does not hold that the national banking act either expressly or impliedly forbids a bank to borrow money, but only that the power to do so is not expressly given by the act. The court concedes that, among the incidental powers necessary to carry on the banking business, is the power, under certain circumstances, temporarily to borrow money, but says, in effect, that it is so much out of the course of ordinary and legitimate banking that the executive

officers of the bank, who have only authority to transact the ordi-
nary business of the bank, could not exercise the power to borrow
money without special authority from the directors.

No special authority appears by the record to have been conferred
on Harper to borrow the money here in question, but complainant
below sought to establish the necessary authority by evidence that in
New York and Cincinnati the executive officers of the bank were,
by a general banking custom, accorded authority to borrow money
on behalf of their banks. Two questions arise upon this evidence:
Does it establish the custom? If it does, can the proof of the cus-
tom supply the place of the special authority decided by the supreme
court to be necessary?

We have set out in the statement of the case, at perhaps too great
length, a résumé of the evidence as to usage, because its sufficiency
has been vigorously attacked by the counsel for the appellant. We
think that the evidence establishes, in a most satisfactory way, that
in 1887, when the loan at bar was made, and for many years previous,
it was the frequent practice of banks in the interior to borrow money
of their New York correspondents; that a similar practice prevailed
in Cincinnati between the country banks in the neighboring terri-
tory and their Cincinnati correspondents, and that the borrowing
was always done by one of the executive officers of the borrowing
bank, and usually by letter; that no special authority from his board
of directors was ever required; and that by the usage of banks in
those two cities, at least, he was treated as having adequate author-
ity for the purpose, as between his own bank and the lending bank.
The only witness whose statement may be considered as falling short
of this is W. A. Goodman, of Cincinnati, and he seems to have had
little experience in transactions with country banks, and none in
borrowing money for his own bank.

It does not militate against our conclusion that several of the
witnesses testified that it was usual and proper for the borrowing
officer to consult his directors before obtaining the loan, or to report
it to them afterwards. There are many important transactions
of the bank concededly within the power of the executive officers,
concerning which they consult their directors or of which they make
report. The question here is not what is the customary duty of a
cashier or other executive officer in keeping his directors informed
of what he is doing, but it is, what is his customary authority in
acting on behalf of his bank and borrowing money from other banks?
It does not detract from the weight of the evidence that the banks
of a majority of the witnesses do not borrow money. It is the lend-
ing bank who has to decide in such cases upon the question of ap-
pearance of authority, and their officers are best able to say what is
the authority, in the matter of borrowing, which well-known usage
gives to the executive officers of the borrowing bank. Moreover,
three of the Cincinnati witnesses had borrowed money for their
banks, and their evidence was like that of the others.

Nor do we see how it affects the question of authority of the bor-
rowing officer that collateral is usually demanded from the borrowing
bank, and that the proceeds are credited in the books of the lending

bank to the borrowing bank, to be drawn out in due course on drafts of the latter. This course of business, which operates as a check upon possible fraud by the officer assuming authority to borrow, does not indicate that he is not given, by custom, the requisite apparent authority to contract the loan on behalf of his bank, but, on the contrary, suggests a reasonable explanation why a custom, by which banks of the borrowing class might otherwise be prejudiced and exposed to risk of loss by the frauds of their executive officers, has been accepted and acquiesced in by them. The failure of the defendant to call witnesses to contradict the evidence of the complainant upon the question of usage lends most significant support to the view that it was well known and generally acquiesced in. Sumner v. Tyson, 20 N. H. 384–387; Insurance Co. v. McLaughlin, 53 Pa. St. 490. The New York and Cincinnati witnesses strongly corroborate each other as to the usage prevailing in both places; for it is well settled that the existence of a well-known usage in one place, or in one trade, has a tendency to establish the same usage in the same trade in another place similarly situated, or in a closely-allied but different trade. Insurance Co. v. McLaughlin, 53 Pa. St. 490; Falkner v. Earle, 3 Best & S. 360; Fleet v. Murton, L. R. 7 Q. B. 126.

The next question is whether the usage proven can make up for the absence of proof of Harper's and Baldwin's special authority to contract this loan. The theory upon which it is offered is that bank directors in Cincinnati, who committed to their executive officers authority to conduct the business of their bank with a New York correspondent bank, were presumed to know the apparent authority which New York usage in the banking business would attribute to those officers, and are estopped, in the absence of special notice to such correspondent bank, to deny that those officers had actual authority equivalent to their customary authority. We think this theory to be sound. The borrowing was done in New York, and it is New York usage which is important here. Bank directors in Cincinnati, doing business in New York, are presumed to know the usages in that city, at least so far as they affect out of town banks. Goodenow v. Tyler, 7 Mass. 36–47; Dwight v. Whitney, 15 Pick. 179–183; Lewis v. Marshall, 7 Man. & G. 729–744; Leach v. Beardslee, 22 Conn. 404; Cropper v. Cook, L. R. 3 C. P. 194; Bibb v. Allen, 149 U. S. 481, 13 Sup. Ct. 950. The presumption of knowledge by the bank directors of the Fidelity Bank of the New York usage is greatly strengthened in this cause by proof that the same usage prevails with respect to the officers of banks bearing the same relation to Cincinnati banks which Cincinnati banks bear to New York banks. Well-established usages of a trade are presumed to be known to all persons engaged in that trade. Carter v. Coal Co., 77 Pa. St. 286. It is noteworthy that the receiver did not call a single witness from the directors of the Fidelity Bank to rebut this presumption as to their knowledge of the usage.

But it is said that to give such effect to the usage is, in effect, to refuse to follow the authority of the Western Bank Case. We cannot understand why. Usage is a matter of fact until it becomes so

general and well known to courts, and is so often recognized by them, as to be crystallized into law. There was no evidence of usage adduced or considered in the Western Bank Case. That makes a broad distinction between that case and the one at bar.

Again, it is said that the usage is illegal, because contrary to the law of the Western Bank Case. The court in that case did not decide that it was unlawful to intrust the vice president or cashier with power to borrow money for his bank; it only held that in the absence of special authority, conferred either by by-law or resolution of the directors, such authority did not appertain to the office of cashier or vice president, but remained with the directors. The manifest inference, from the language of the opinion, is that, if the directors chose to do so, they might expressly confer such authority by a by-law. If they could do this by a by-law, why may they not by acquiescence in a well-known usage effect the same result? Can, therefore, a usage which assumes the conferring of authority be unlawful? We think not. It cannot affect the validity of the usage that it may have derived strength from, or even had its origin in, decisions of the state courts which differ from the decision in the Western Bank Case. It is undoubtedly true that there were decisions in the state courts of New York, Pennsylvania, Missouri, Wisconsin, and Ohio (Barnes v. Bank, 19 N. Y. 152; Bank v. Sullivan, 11 Wkly. Notes Cas. 362; Donnell v. Bank, 80 Mo. 165; Sturges v. Bank, 11 Ohio St. 153, 167; Rockwell v. Bank, 13 Wis. 653; Ballston Spa Bank v. Marine Bank, 16 Wis. 120–134) which take a different view of the implied authority of the cashier to borrow money for his bank; but if these decisions have given rise to a usage in New York and Cincinnati well known and recognized by bankers in both places, and having only the same result which might lawfully be brought about by express action by each board of bank directors, it is difficult to see why, because the origin of the usage may have been in an erroneous view of the law of implied authority of a cashier, it should not be binding on those who engage in business with a knowledge of and acquiescence in it.

In Merchants' Bank v. State Bank, 10 Wall. 604, a suit between two national banks, the question was whether the cashier of one of them had authority to certify three checks, amounting in all to $600,000, to pay for certain gold coin bought of the other. It did not appear that the cashier had ever certified checks before or bought gold. Evidence by the officers of 22 banks in Boston was admitted to show a usage by which, without by-law or vote, powers were intrusted to cashiers of such banks to borrow and lend the money of their banks of and to each other, to buy and sell exchange of and to each other, and in all such transactions to pledge the credit of their respective banks,—usually by cashiers' checks, sometimes by certificates of deposit or memoranda; that these transactions were frequent, involving large sums of money; and that they were uniformly conducted in faith of the implied powers of cashiers, without inquiry. The supreme court held the evidence competent for the jury to consider on the issue whether the cashier had power to buy gold and certify checks without special authority from the board of directors. The ruling in this case certainly upholds the view that a well-known usage, by which an executive

officer of a bank exercises authority to do acts on its behalf, which otherwise could only be done by the directors, is equivalent to a specific delegation of authority by the board. It is worthy of note that the usage, which was here held admissible to show apparent authority, was one by which cashiers were permitted to borrow large sums of money for their banks without receiving special authority from their directors. It is hardly conceivable that the supreme court would have held such usage admissible in evidence if it was illegal or unreasonable.

Our conclusion is that the complainant, by its proof of usage, has taken this case out of the rule laid down by the supreme court in the Western Bank Case, and has shown thereby that Harper and Baldwin had apparent authority to make this loan for the Fidelity Bank.

2. The conclusion just reached, based upon the usage of banks, is greatly strengthened when we come to consider the actual authority exercised by Harper in the affairs of the Fidelity Bank. It is evident, from the facts set forth at length in the statement of the case, that the board of directors was practically chosen by Harper for the very purpose of giving him free rein in the management of the bank, and in the use of its funds and its credit to carry on enormous wheat gambling transactions on the Chicago market. He selected as directors for this purpose, in addition to himself, Baldwin, the cashier, and Hopkins, the assistant cashier, who had previously been engaged in a similar transaction with him at the Third National Bank, and who were privy to his present plans; and two of his own employés, Mathews and Gahr, whom he had qualified by gifts of stock, and who confessedly were only his representatives on the board, and quick to do his bidding. When a director manifested any desire to look into his management, he dropped him from the board at the first opportunity. That Harper in this way succeeded in having the whole power of the board of directors delegated to him, in fact, is clearly manifest from what he did in the bank. The indifference of the directors is most emphatically shown by a failure of a quorum to attend the regular monthly meetings for five months, and by the perfunctory and merely formal matters passed upon by the board when a sufficient number did meet. The subordinates in the bank, whose assistance was necessary to Harper in making the transfers of funds to his credit, and in carrying in the cash account worthless checks aggregating three times the capital of the bank, recognized Harper as the manager, not only of the bank, but of the directors. The slightest questioning of one of them at any time during the last six months would have developed the peculiarities of Harper's control. Indeed, it is quite clear that the flagrant violation of one of their by-laws by Harper, in respect to "cash items," was well known to more than the majority of the board. In order to effect the loan here in question, and other loans, he took from the bank large quantities of the bank's bills receivable, to be used as collateral, without registering any explanation of their whereabouts, and without arousing the slightest inquiry, either by the president or any of the directors. When, near the close, a loan had to be secured in a fruitless effort to save the bank, he negotiated one, and sent away a million dollars' worth of bills receivable, without any authority from the board. We think that, for practical purposes, Har-

per was the bank, and that the directors recognized him as such, and that, included in such a delegation of authority as this condition of affairs implies, was the power to borrow money, if, as held in the Western Bank Case, that power rests with the directors. We reach this result, not only on the direct evidence, but also upon the bill of the appellant herein filed against the directors, in which the averments paint, in the strongest colors, the supreme authority over bank and directors which Harper was allowed to exercise, and which does not lose evidential force from the fact that the receiver obtained, in compromises, $450,000 from the solvent directors on the character of his averments and the strength of the proof adduced by him in support of them.

In Martin v. Webb, 110 U. S. 7, 3 Sup. Ct. 428, the issue was whether a bank was bound by the act of its cashier in having canceled obligations of its debtor, secured by a first lien on his property, in exchange for a partial payment on them and new obligations secured by a second lien. It was conceded by the court that the ordinary powers of a cashier do not include the release of security and the canceling of any obligation due the bank, except upon payment; but Mr. Justice Harlan, delivering the opinion of the court, set out at some length the circumstances, to show that, in fact, the whole business of the bank had been delegated to the cashier by the directors, whose supervision over him was most perfunctory, and who were very little in the bank, and that, if the directors did not abdicate all authority as such, they acquiesced in the cashier's assumption of exclusive management of the bank's business, and held that the directors and the bank could not be heard to deny the requisite authority in the case in hand. Mr. Justice Harlan's language, in closing his opinion, was as follows:

"It is quite true, as contended by counsel for appellants, that a cashier of a bank has no power, by virtue of his office, to bind the corporation except in the discharge of his ordinary duties, and that the ordinary business of a bank does not comprehend a contract made by a cashier—without delegation of power by the board of directors—involving the payment of money not loaned by the bank in the customary way. Bank v. Dunn, 6 Pet. 51; U. S. v. City Bank of Columbus, 21 How. 356; Merchants' Bank v. State Bank, 10 Wall. 604. Ordinarily, he has no power to discharge a debtor without payment, nor to surrender the assets or securities of the bank. And, strictly speaking, he may not, in the absence of authority conferred by the directors, cancel its deeds of trust given as security for money loaned,—certainly not, unless the debt secured is paid. As the executive officer of the bank, he transacts its business under the orders and supervision of the board of directors. He is their arm in the management of its financial operations. While these propositions are recognized in the adjudged cases as sound, it is clear that a banking corporation may be represented by its cashier—at least where its charter does not otherwise provide—in transactions outside of his ordinary duties, without his authority to do so being in writing, or appearing upon the record of the proceedings of the directors. His authority may be by parol and collected from circumstances. It may be inferred from the general manner in which, for a period sufficiently long to establish a settled course of business, he has been allowed, without interference, to conduct the affairs of the bank. It may be implied from the conduct or acquiescence of the corporation as represented by the board of directors. When, during a series of years, or in numerous business transactions, he has been permitted, without objection and in his official capacity, to pursue a particular course of conduct, it may be presumed, as between the bank and those who, in good faith, deal

with it upon the basis of his authority to represent the corporation, that he has acted in conformity with instructions received from those who have the right to control its operations. Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business."

Now, it is quite true that the holding out in the case at bar was of a somewhat different character from that in the case cited. Here the power to transfer the bank's collateral, the acquiescence in the accounts current based on the loan for three successive months, the interchange of collateral, the negotiation by Harper of a second loan for $1,000,000, and the transfer of the requisite collateral, were all circumstances reflecting on Harper's authority, upon which the Chemical Bank might rely in either making the loan or not compelling its payment by those contracting it before the failure.

In Davenport v. Stone, 104 Mich. 521, 524, 62 N. W. 722, 723, the principle is stated as follows:

"The directors intrusted the entire management of the bank to Mr. Bradley [the cashier]. Therefore neither the bank nor its receiver can now be heard to deny the authority of the cashier to do any of those acts which it or its directors might lawfully authorize the cashier to do."

The act in question in that case was the rediscount of a renewal note. In Wing v. Bank, 103 Mich. 565, 61 N. W. 1009, the same principle was recognized, where the act of the cashier, the validity of which was in issue, was the release of a surety from a note held by the bank. In Bank v. Perkins, 4 Bosw. 420, the issue was, like that at bar, as to the binding effect upon a bank of a loan contracted in its name by one of the executive officers. In that case the cashier had had exclusive control of the bank for several years, without any supervision or interference by the directors. This particular loan the cashier had taken to himself after its proceeds came to the bank. The superior court of New York, made up of Chief Justice Bosworth and Judges Woodruff and Moncrieff, stated, as the principle which led them to hold the bank, that where directors of a bank allow its cashier for several years in succession, without interference or inquiry by them, to transact the business of the bank in such manner as, in his judgment, may be proper and for its interest, they thereby, in effect, authorize him to make all and any contracts which he deems expedient in relation to its business that the directors might lawfully make, and such contracts will conclude the bank, as between it and a party who has dealt with it through such cashier, and, on the faith of his having authority to make such contracts, has loaned money to such bank, provided the charter of the bank does not prohibit it from making such contracts through its cashier. The case was affirmed by the court of appeals on another ground. Bank v. Perkins, 29 N. Y. 554. See, also, to the same point, Cox v. Robinson,

82 Fed. 277, a decision by the circuit court of appeals for the Ninth circuit.

3. Another distinction between the Western Bank Case and the one at bar grows out of the relation which existed between the Chemical Bank and the Fidelity Bank as correspondent banks exchanging monthly statements of the account between them for the prior month. In the Western Bank Case there was no such relation between the two banks involved. This difference has an important bearing on the question of notice to the directors and ratification by them of the loan. The supreme court, in the Western Bank Case, in effect says that when the loan was made to the Fidelity Bank, at the instance of an unauthorized agent, the lending bank could not predicate ratification of the loan by the Fidelity Bank without bringing knowledge of the same home to the directors, the only body in the bank with authority to make the loan. The general rule as to ratification is, as we conceive it, that a failure to repudiate the unauthorized act of an agent can never work a ratification of the act, unless the principal either has actual knowledge, or, by the exercise of due diligence, would have had knowledge, of the act. Now, due diligence presupposes an affirmative duty owing from the principal to the other party to advise himself of the fact. In the case of a stranger seeking relations with a principal through an unauthorized agent, no duty arises on the part of the principal towards the stranger to inform himself of an agent's unauthorized acts, because he has the right to assume that the agent will not attempt to exercise authority not intrusted to him, and that a stranger will not credit the agent with greater authority than he has. Such was the Western Bank Case, and so the principle stated by the court had full application there. But where there is an existing relation between the principal and the other party, imposing on the former a duty of knowledge in respect of a class of facts which embraces the unauthorized act, then a neglect by the principal to discharge the duty and inform himself will have the same effect as actual knowledge upon the issue of his ratification of the unauthorized act by estoppel. To illustrate by the case of Leather Manufacturers' Bank v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657: There a depositor in a bank was held to ratify, by estoppel, his agent's forgeries in raising checks by failure to repudiate them, not because of his knowledge, but because his relation to the bank as a depositor bound him to advise himself, from the statements sent by the bank to him, as to the condition of his account, and the validity of the checks, payment of which was noted therein. Had the forgeries been passed upon a stranger, the principal could not have been held to ratify them in favor of the stranger on the ground that he had been careless in not supervising his agent in the drawing of checks. He would, in that case, have owed no duty to the stranger of which his careless confidence in his agent would have been a violation. In the case at bar the Fidelity Bank bore much the same relation to the Chemical Bank that an individual depositor does to his bank. The Chemical Bank submitted monthly statements of the current account between it and the Fidelity Bank to the latter bank, and in due course the latter bank re-

turned a .reconcilement sheet, showing discrepancies, if any existed, and correspondence continued until the differences were explained and reconciled. This was the regular course of business between the two banks from the organization of the Fidelity till its close. The affirmative duty was thereby imposed upon the Fidelity Bank to inform itself of the correctness of the items therein charged, and to object to the same if unwarranted or erroneous. Negligence in doing so was a failure of duty towards the Chemical Bank, and was the equivalent of actual knowledge of those things which proper inquiry would have developed. Notice through such accounts was notice to the directors of the items therein contained, because it was notice to the Fidelity Bank by the course of business between the two banks. The directors cannot rid themselves of such notice by saying that their agents failed to communicate the facts to them. As between them and the Chemical Bank, they were under an affirmative duty to examine into the accounts, and so a neglect by the agents to discharge this duty was their negligence. Now, it might be that, if the agent who committed the fraud originally was the only person to make the examination, his failure to report it could be considered so much a part of his scheme to defraud that notice to him would not be notice to the bank. But here no such difficulty arises. The account current for March and the books of the Fidelity Bank differed in this: that the account current showed the source of a credit to the Fidelity Bank of $300,000, of the date of March 2, 1887, to be a temporary loan from the Chemical Bank to the Fidelity Bank. The books of the Fidelity Bank showed the source of the same credit to be a deposit in the Chemical Bank by Harper to the credit of the Fidelity. The bookkeepers of the Fidelity negligently overlooked the discrepancy, and, by sending a reconcilement sheet calling attention to other items, in effect reported to the Chemical Bank that the item of $300,000, as contained in the account current, was correctly set forth therein. They were not privy to the fraud, and, if they had discovered the difference, it would have been their duty to prepare a letter to be forwarded to the Chemical Bank calling attention to it, and to have told the executive officers of the bank of it. The general bookkeeper says that he would have reported it to the cashier, but one would think that a discrepancy so vitally concerning the personal account and integrity of the vice president would be reported to the president. In any event, we can not presume that such a discrepancy would have been suppressed, if the president, who was certainly not privy to the fraud, had been exercising any care.

If our theory of notice to the directors by the monthly accounts current is correct, then this case cannot be distinguished from the Leather Manufacturers' Bank Case, already cited. The grounds for an equitable estoppel, based on the delay in repudiating the loan, are clearly shown. It appears that, more than a month after the acquiescence by the Fidelity Bank in the account containing the item of the $300,000 loan, the Chemical Bank, on the faith that the loan was a loan to the Fidelity Bank, consented to a substitution of worthless collateral for good collateral at the instance of Harper, as

vice president.    It is also quite probable that, had the Chemical Bank known that there was any doubt as to Harper's authority in April, it would have saved itself from loss by recourse to Harper.

The effect of notice through monthly statements made in due course by one bank to another of unauthorized transactions of agents is clearly shown in the case of Kissam v. Anderson, 145 U. S. 435, 12 Sup. Ct. 960.    In that case the cashier of a country bank drew bank drafts on its New York correspondent bank in favor of New York brokers, who were conducting a speculation for him.    The country bank failed, and its receiver sued the brokers for the money of the bank, because received by them on these drafts with knowledge that the cashier was using the funds of his bank for private speculation.    The brokers sought to have the claim reduced by deposits which they had made to the credit of the country bank with its New York correspondent by direction of their client.    It appeared that the New York correspondent sent regular monthly statements of the deposit account to the country bank showing these credits, but they were not transferred to the books of the country bank, and some of the accounts thus sent were not even opened.    The cashier drew new drafts on these deposits, and squandered the money elsewhere. The circuit court held that unless it appeared that these deposits actually reduced the sum total of the cashier's total defalcations, by whatever means, below the amount of the drafts received by defendants, they could not set off the deposits returned by them.    The supreme court, in an opinion by Mr. Justice Brewer, reversed the judgment of the circuit court.    He said:

"Defendants returned this money to the Albion Bank.    They deposited it with the Third National Bank, the correspondent of the Albion Bank, and the bank from which they received the money on the checks from the Albion Bank. In fact, therefore, the money was placed where it was before it was taken,— in the possession and under the control of the Albion Bank.    Not only that, the Third National Bank, in its due course of business, by monthly reports, informed the Albion Bank that they had received this money, and held it subject to its order; and it was subsequently used by the Albion Bank in drafts drawn by it in favor of other parties.    If it be said that no officer of the Albion Bank knew of these deposits except Warner, the wrongdoer, and that he subsequently drew out most of these moneys in drafts to further other wrongs, the reply is that the other officers and directors of the Albion Bank were chargeable with knowledge of these deposits.    If, through their negligence, they did not in fact know, that is a matter for which the Albion Bank, and not the defendants, were responsible.    Kissam, Whitney & Co. had no supervision over its affairs,—no knowledge as to how those affairs were managed.    They were not called upon to go to Albion and hunt up the various officers and directors, and inform them, one by one, personally, that these moneys had been deposited to their credit in the Third National Bank.    It was enough that they deposited them, and that that bank, in the regular course of business, by monthly statements, informed the Albion Bank that it received and held those moneys. *  *  *  It will not do to say that they put the money where he could check it out, and therefore are responsible for what he did with it.    They deposited it to the credit of the Albion Bank, and it was for the officers and directors of that bank to take care of its deposits.    The rule might be different if Warner, the cashier of the Albion Bank, was the only officer authorized to draw on the Third National Bank, or charged with knowledge of the state of the account; but the president and teller had equal authority, and were equally chargeable with knowledge.    In fact, it appears that these officers did draw drafts on the New York bank, and thus diminished the total amount of deposits, and the other directors, also, were under some obligation to know the affairs

of the bank; and it will not do to say that the bank can ignore the negligence of all its officers and profit by their omission of duty."

The same effect was given by Judge Drummond to monthly accounts current between correspondent banks in Burton v. Burley, 13 Fed. 811, where a bank president had paid his personal debts by directing charges to be made upon the correspondent bank's books against his own bank.

4. Another distinction said to exist between the case at bar and that of the Western National Bank is that there the money borrowed from the Western Bank was at once drawn out by drafts payable to Harper, and not a penny of it went to the benefit of the Fidelity, while here the credit of $300,000 obtained by the loan was drawn out on drafts issued to meet legitimate obligations of the Fidelity Bank. Upon the day upon which the credit was given in New York to the Fidelity Bank by the Chemical Bank for the loan, however, Harper directed a credit to be made in his favor on the Fidelity books of $300,000, and a charge of that amount to the Chemical Bank, and he afterwards checked out this credit. Under the circumstances, can the Chemical Bank hold the receiver as for money had and received? The question is not free from difficulty, and as the members of the court might not be able to agree in their conclusions upon the same, and as the grounds already stated are quite sufficient to require the court to affirm the judgment of the circuit court, we do not decide the point. The decree of the circuit court is affirmed, with costs.